## THE STATE v. MANLEY PANKEY.

*Homicide—Malice—Judge's Charge—Trial.*

1. Where the accused had formed a particular and definite purpose to kill, and, in pursuance of that purpose, armed himself, sought the deceased and killed him: *Held* to be murder, no matter what provocation was given or how high the assailant's passions were aroused during the fight.

2. An omission to require a prisoner charged with a capital felony, who is at the bar of the Court when the jury returns the verdict, to stand up and look upon the jury, will not affect the verdict or judgment thereon.

Indictment for Murder, tried before *Merrimon, J.*, at Fall Term, 1889, of MONTGOMERY Superior Court.

The evidence tended to show that the prisoner and deceased were at one Joe Jackson's, at dinner, and got into an altercation on account of something the deceased said about Austin Green; that the prisoner went out and sat upon a fence, and deceased took out his knife, opened it, and went out and sat upon the fence near by and commenced whittling; that deceased said to prisoner "he ought not to be making fun of Austin Green, as he was away from home, among strangers and in a strange place," and deceased said to prisoner, "You had better take his place"; prisoner replied that he would, or could, and deceased told him he had better, "damned quick"; then prisoner told deceased he would take Green's place; that Austin Green started out and said he was going home, and went some forty yards, when prisoner called him back and went to him, and called Joe Jackson to where he was; that they held a conversation, in which the prisoner said, "I am going off and get me a gun, and I am going to shoot this damned negro's heart out"; that prisoner went off, a mile and a half or two miles, procured a double-barrelled shotgun, came back and inquired where deceased was, and said he was going to kill him, and, on being informed where he had gone, went in that direction some distance, stopped and waited some time (not definitely stated how long), when he saw deceased approaching; that, when deceased was within about fifteen yards of him, he said, "Oh, yes, God damn you, I am going to shoot your dern heart-strings loose"; that deceased came right on, but said nothing till he got within five steps of prisoner; the prisoner stepped from five to eight steps from the path he and deceased were in; deceased raised his arms, having nothing in his hands, and told prisoner to shoot, and prisoner shot and hit deceased in the right side of the neck, and he fell down and died instantly. It was admitted by the prisoner that he killed the deceased with a gun by shooting him.

The prisoner testified that he did not say that he was going to get a gun to kill the deceased; that he did not say he would kill him; that he borrowed the gun to shoot a squirrel, and had no intention of shooting deceased; that he did not go to meet him for the purpose of shooting him, but was on his way to Mr. Pool's, for whom he had been working, to settle with him; that he met deceased unexpectedly; that deceased had his knife out and opened, and up his sleeve; that he, prisoner, got out of the path to avoid him; that some one exclaimed, "Look at his knife!"; that he told deceased not to come to him, or he would shoot him; that deceased came right on and said to shoot, and he did shoot, and for no other reason than to protect himself; that his aim was to shoot him in his legs, but in his excitement, produced by the assault upon him, he shot sooner than he intended. There was other evidence, tending to show that the deceased, at the house of Joe Jackson, had said he would split the prisoner's head open—that this was after the quarrel about Austin Green.

The prisoner and deceased were both negroes, under twenty-one years of age, and had been friends up to the time of the quarrel mentioned in the evidence. They had been working together up to that time.

The Court called the attention of the jury to the evidence tending to prove that the prisoner had formed a purpose to kill the deceased, and that he killed him in pursuance of that purpose, and then recited to them the prisoner's evidence tending to corroborate him, and instructed the jury—first, that if they found from the evidence that the prisoner had formed *a particular* and *definite* purpose to kill the deceased, and in pursuance of that purpose procured the gun and sought the deceased and shot and killed him, he was guilty of murder, no matter what deceased was doing at the time he was shot; second, that if the prisoner had not formed the purpose to kill the deceased, but had procured the gun to kill a squirrel, and met the deceased and

the deceased assaulted him with a knife, in the manner described by the prisoner, and the prisoner shot and killed him when he might have avoided the assault without killing him, it was manslaughter. But if the prisoner was so closely pressed by the deceased that he could not escape the assault made upon him, and was in danger of losing his life, or of receiving serious bodily harm at the hands of the deceased, or had reasonable grounds to believe, and did believe, he was in such danger, and shot and killed him to save his own life, or to avoid great personal injury, he was not guilty of any offence.

The Court again recited the evidence applicable to these several propositions of law, and cautioned the jury that they must find that the prisoner had deliberately made up his mind to kill the deceased, and shot and killed him in pursuance of a definite intent to kill him, or they could not convict of murder.

The prisoner was personally present throughout the trial, and when the verdict was rendered, but the formality of requiring him to stand up and look upon the jury, &c., was, by inadvertence, omitted.

There was a verdict of guilty, and from the death sentence pronounced thereon the defendant appealed.

*The Attorney General*, for the State.
No counsel for the defendant.

SHEPHERD, J.: We have carefully considered his Honor's instruction, and we are unable to find any error of which the prisoner can complain.

Every aspect raised by the testimony was with great particularity presented to the jury, and the law applicable thereto was correctly and intelligently explained.

Among other things, the Court charged the jury, "that if they found from the evidence that the prisoner had

formed a *particular* and *definite* purpose to kill the deceased, and in pursuance of such purpose procured the gun and sought the deceased and shot and killed him, he was guilty, no matter what the deceased was doing at the time he was shot." To this part of the charge the prisoner excepted. There can be no serious question but that there was abundant testimony to support the instructions. After a quarrel with the deceased, the prisoner said: " I am going off and get me a gun and I am going to shoot this damned negro's heart out." The case further states that there was testimony tending to show the following facts: That " the prisoner went off a mile and a half, or two miles, procured a double-barrelled shotgun, came back and inquired where deceased was, and said he was going to kill him and on being informed where deceased had gone, went in that direction some distance, stopped and waited some time (not definitely stated how long) when he saw deceased approaching. When deceased was within about fifteen yards of him, he said: " O yes, God damn you, I am going to shoot your dern heart strings loose:" that deceased came right on, but said nothing till he got in a few steps of prisoner; the prisoner stepped from five to eight steps from the path he and deceased were in. Deceased raised his arms, having nothing in his hands, and told prisoner to shoot, and prisoner fired and hit the deceased in the right side of the neck, and he fell down and died instantly."

The testimony surely authorized the instruction given by the Judge, and the principle which he declared is so clearly correct that it is hardly necessary to cite authority in support of it.

An extract from *State* v. *Gooch*, 94 N. C., 1014, will suffice our purpose. The Court said: " If the jury believe from the evidence that the prisoners went to the store of Cheatham with the purpose, under the pretense of fighting, to stab Cheatham, and either the one or the other stabbed and

killed the deceased, it was murder in the assailants, no matter what provocation was given, or how high the assailant's passions were aroused during the fight, for the motive in such a case is express." *State* v. *Lane,* 4 Ired.. 113; *State* v. *Hogue,* 6 Jones, 381; *State* v. *Martin,* 2 Ired., 101; Whart. Crim. Law, § 950.

2. After the sentence was pronounced the prisoner excepted, because when the verdict was rendered " the formality of requiring him to stand up and look upon the jury was, by inadvertence, omitted." The object of this formality is to identify the prisoner, and while it is better to observe the form, a failure to do so, where there is no question as to the actual presence of the prisoner, is by no means fatal to the verdict. Mr. Bishop, in his second volume Crim. Prac., § 829, says that "there is no reason to suppose that any minute departure from the old form will vitiate the verdict." There is no merit in the exception, and it must be overruled.

3. The remaining exception is addressed to the refusal of the Court to continue the case because of the absence of an alleged material witness. It is too plain for argument that this was within the discretion of the trial Judge, and that his ruling in this respect cannot be reviewed by this Court.

Affirmed.