The defendant was indicted in the Superior Court of Randolph County for the murder of John M. Armstrong, the homicide having been committed on 24 March, 1913. The trial took place at July Term, 1913, when defendant was convicted of murder in the second degree, and was sentenced to imprisonment for twenty-five years.
The special nature of the defense is indicated by the following testimony, taken from the record:
"On the trial, evidence was offered by the State showing that the defendant and the deceased were engaged in the business of leasing lands and looking after lodges for hunting purposes, the defendant for the Archdale Shooting Club and the deceased for George Gould, and that the deceased succeeded in leasing some lands which the defendant wanted, and the defendant had gotten mad with the deceased on that account, and had cursed him and had some time before that threatened to kill him; that on 24 March, 1913, about 5 o'clock in the afternoon, the deceased, who lived near High Point, came through Archdale, returning to his home, and stopped near the house of Mr. Horace Ragan in order to see Mr. Ragan about the purchase of some cattle; that the (500) deceased was traveling in an automobile and accompanied by William White; that they found Mr. Ragan, and while looking at the cattle, which were in a lot belonging to Mr. Ragan and immediately in the rear of the defendant's house, the defendant saw deceased and went to his barn, hitched his horse to his buggy and drove up to where he had seen the deceased and Ragan standing. While he was hitching his horse to his buggy, the deceased and Ragan had gone in an opposite direction away from defendant's house, to Mr. J. L. Freeman's, to look at a pony, several hundred yards from where the defendant had seen them and out of his sight; that defendant was seen to drive in his buggy up to the place where the deceased had left his automobile and where defendant had seen deceased and Ragan standing, and peering around the automobile and into a barn near-by, as if he were looking for some one; that the roads fork at the place where the defendant had driven up, and he first went up one fork of the road, and seeing nothing of the deceased, he came back and placed his buggy in the forks of the road between the deceased's automobile and Freeman's, so that whichever way the deceased returned he would have to pass the defendant; that the defendant waited there until the deceased and Ragan and White and Freeman and his son returned from looking at the pony; that defendant allowed Ragan and White to pass him without interference, while deceased had stopped close by to speak to Mr. Moses Hammond and George Miller, who stood at Hammond's gate and within a few yards of the buggy; that deceased, after shaking hands with Hammond *Page 401 
and Miller, approached the buggy in which the defendant sat, spoke to defendant, shook hands with him, and as deceased turned away to go on with Ragan and White, defendant called to him and said, `I have something for you,' and as he spoke, drew his pistol and fired at deceased; that deceased was unarmed, and dodged and ran to a tree very close by, and as he ran, just before he reached the tree, the defendant shot again, hitting the deceased in the back, the bullet penetrating the intestines in twenty-one places and inflicting a wound of which the deceased died the next day; that after the defendant had shot the deceased and deceased had gone behind the tree, the defendant (501) turned and fired twice at George Miller, who stood on the opposite side of the road, and towards whom it was shown that he had very bitter feelings and whom he had threatened to kill; that after firing five times, the defendant reloaded his pistol, and when Ragan and White picked up the deceased to carry him to Ragan's house, defendant followed them along in his buggy until he heard the deceased say that he was killed and was going to die, when defendant turned and went on to his house, put up his horse and buggy, returned to his house, went out on the porch, drew his pistol and called to his wife to come and see him finish what he was going to do; that some neighbors came in and took the pistol from the defendant, and shortly thereafter he left his home, went into the woods and remained there until about noon the next day, when he was found and arrested.
"The defendant testified that about five years ago his first wife died, and shortly thereafter he began to take morphine and continued to take it, in the form of what is called papine, for about three years; that papine is a liquid preparation sold in 8-ounce bottles and contains 8 grains of morphine and 11 per cent of alcohol; that he contracted the morphine habit, and for seven and one-half months he used as much as 8 ounces of papine a day, thereby taking 8 grains of morphine and a quantity of alcohol daily, in consequence of which he was taken to a sanitarium and treated and cured of that habit; and shortly afterwards he began to use whiskey, drinking as much as a quart a day for two years before the homicide; he took a drink of whiskey in Dr. Tomlinson's office, and from that time until after the killing his mind was utterly blank, and that he did not come to himself until after the shooting, when he heard his wife scream, and that when he heard his wife scream he came to himself. Defendant also offered the evidence of certain witnesses that at different times during a period of four or five years they had seen the defendant when they though he was in such a mental condition that he did not know what he was about.
"All the witnesses who saw the homicide, six or seven in number, *Page 402 
(502) some of whom had known the defendant all his life, testified that defendant was cool and deliberate in what he did, and that his mind was all right and that he knew what he was doing; and other witnesses for the State testified that they had known him for years; that they had had business transactions with him on the very day of the homicide and but a few hours before, and that the defendant was perfectly sober, and that his mind was all right and just as good as that of any average man. One of these witnesses, Mr. Woodall, who lived at Archdale, in plain view of the defendant's house and premises, and who saw the defendant drive up in his buggy apparently looking for some one at the place where the deceased had driven up in his automobile, testified that he heard the shots fired and heard the defendant's wife scream, and he ran down to see what had happened, and saw the defendant sitting in his buggy with a pistol in his hand and found the deceased wounded and being carried to the house of Horace Ragan; the witness lived about 250 yards from the house of the defendant and about 150 yards from where the shooting occurred."
With reference to the plea of insanity and the effect of intoxication or the liquor and morphine habit upon the defendant's mental state or condition, the court, at defendant's request, gave the following special instructions:
"1. The jury is instructed that although they might find from the evidence that the defendant committed the criminal act, in the manner and form as charged in the indictment, still, if the jury believe from the evidence that at the time he committed the act he was so affected by long and continued use of alcoholic liquors or drugs, or both, that he did not know the nature of the act, whether it was wrongful or not, and did not know his relations to others, and that such mental deficiency was induced by antecedent and long continued use of such intoxicating drinks or drugs, and not the immediate effects of intoxication, then the defendant cannot be held criminally responsible for such act, and the jury should find the defendant not guilty.
"2. In determining the question whether the defendant was (503) insane at the time of the alleged commission of the crime, the jury are to consider all of his acts at the time of, before, and since the commission of the crime, as such acts and conduct have been shown by the evidence; and the jury should consider the defendant's appearance and actions at the time of, before, and after the commission of the offense, and if the jury is satisfied from the evidence that at the time defendant shot the deceased, defendant was so affected in his mind and memory that he was not able to distinguish right and wrong and had no knowledge and understanding of the character and consequences *Page 403 
of the act, and power and will to abstain from it, then he was not a legally responsible being, and the jury should find (defendant) not guilty.
"3. The court instructs you that if you are satisfied from this evidence that the prisoner was of insane mind to such an extent that he was not conscious of the nature of the act he was doing, then you ought to acquit him on the ground of insanity.
"4. The court instructs you that if you are satisfied from the evidence in this case that at the time of the commission of the offense the defendant was suffering from mental aberration or sickness of mind produced by any cause, and by reason thereof his judgment, memory, and reason were so perverted or dethroned that he did not realize the nature and quality of the acts he was doing, or that he did not realize that it was wrong, you must find that he was insane, and for that reason not guilty."
The court then, in its general charge, proceeded as follows:
"These prayers requested by the defendant, to which I have called your attention, I give you; and in this connection also, to present the prisoner's defense more fully, and the State's contention with regard to it, I add the following: The prisoner pleads that at the time of the alleged shooting of the deceased that his mind was dethroned and that he had not the mental capacity to distinguish between right and wrong; that he did not have the power to premeditate and deliberate upon the nature and consequence of his act, and that in the eye of the law he is excused. The burden of this plea is upon him, and not upon the State, to satisfy you of its truth, for in law he is presumed to be (504) sane, not insane. This presumption of the law is rebuttable by evidence, and to do so he is not required to establish his plea beyond a reasonable doubt, but it is incumbent upon him to establish it by evidence to your satisfaction. The prisoner, to be responsible for his act, must have had legal capacity at the time to distinguish between good and evil, and to have known what he was doing, to comprehend his relations towards others, the nature of his act, and to have had a consciousness of wrongdoing. In the inquiry as to the prisoner's mental condition he is assumed to have been sane, that is, to have had the degree of mind and reason required to constitute criminal responsibility for his acts, but the want of such legal capacity may appear by evidence of the presence of insanity. The measure of criminal responsibility is this: If the prisoner at the time of the homicidal act was in a state of mind to comprehend his relations to others, the nature and criminal character of the act, was conscious that he was doing wrong, he was responsible for his act. Otherwise, he was not, and your verdict will be *Page 404 
as you find the facts from the evidence. If you find the prisoner was intoxicated at the time of the alleged homicide from the use of some exciting stimulant, and you, notwithstanding, find and are satisfied beyond a reasonable doubt that he had mind sufficient to have a fixed purpose and to plan, and that he deliberately and with premeditation formed the design to kill the deceased, and that he deliberated and premeditated upon the killing, in consequence of such formed design, and that, in consequence of such formed design, he executed it and shot and killed the deceased, then the fact, if found, that the prisoner was intoxicated, would not excuse the act, but the offense would under such findings be murder in the first degree. If, however, you have a reasonable doubt as to the shooting and killing with premeditation and deliberation, but you find that the prisoner had capacity to comprehend his relations to others, was conscious that it was wrong to take the life of a fellowman, and knew the nature of the act he was committing, and under these circumstances you find that he shot and killed the deceased, he would be guilty of murder in the second degree, and you would (505) so find. If, however, upon a review of all the evidence you find that the prisoner killed the deceased as alleged by the State, but you find that at the time of the killing he was insane, or was in a state of mind not to comprehend his relations to others, nor the nature and criminal character of the act, when he shot the deceased, and was not conscious that he was doing wrong, under these findings, if so made by you, he would not be responsible, and upon such findings you would acquit the prisoner. The burden of establishing the plea of insanity, however, with the specification as I have heretofore explained, is upon the prisoner, and not upon the State. With regard to this plea, which is made by the prisoner, that he was not able to know what he was doing at the time, and which is more fully set out in the instructions which I give you, I will now state the contentions of the parties."
The presiding judge then very carefully reviewed the testimony and stated fully, fairly and impartially the several contentions of the parties, and concluded his statement as follows:
"I cannot give you all the contentions made by the parties on both sides with regard to this matter, gentlemen. If I have left out any meritorious contention, that is to say, a contention as to the facts based upon evidence which addresses itself to your conviction, whether made by one side or the other, I ask you to consider it and give it such weight as you think it deserves." The court then instructed the jury what verdict they could render according as they found the facts to be. From the judgment rendered upon the verdict, the prisoner appealed to this Court. *Page 405 
The prisoner noted several exceptions during the course of the trial, and we will now consider them in the order they are stated in the record.
The first exception was taken to the ruling of the court refusing a motion for a continuance. The motion was heard upon (506) affidavits; and it appears therefrom that it was made on the ground that the defendant was unable to procure the attendance of certain witnesses. A reading of the affidavits, and the circumstances attending the making of the motion and the ruling of the court thereon, show that there was no abuse of discretion. The granting of a motion for a continuance is in the discretion of the trial court. S. v. Scott,80 N.C. 365; S. v. Pankey, 104 N.C. 840; S. v. Sultan, 142 N.C. 569;S. v. Hunter, 143 N.C. 607. The decision thereon is not reviewable, except to see whether there has been a clear abuse of discretion. S. v.Lindsey, 78 N.C. 499. It appears that the judge, with the full consent of the solicitor, proposed to postpone the trial of the case, so that the defendant could take the deposition of the absent and infirm witnesses, and further suggested, the solicitor consenting, that defendant might name the time and place for taking the deposition, and select the commissioner whom the court would appoint for the purpose, "the entire matter being left with the defendant and his counsel, provided the testimony was taken so that the trial could proceed during the term. The defendant's counsel declined to suggest to his Honor the name of the commissioner or to take the deposition of the said witness, and had nothing further to say in response to his Honor's suggestion and the agreement of the counsel for the State," and his Honor thereupon ruled that the trial should be proceeded with, and the defendant excepted. The court exercised its discretion fairly, even liberally, and the refusal of defendant to accept the terms offered by it deprives him of any possible ground of objection. Under the circumstances, he was surely not prejudiced. The case of S. v. Blackley, 138 N.C. 620, which he cites in support of this exception, does not sustain it, but, on the contrary, supports the action of the court, for there it is said that a ruling upon a motion for a continuance is not reviewable by this Court on appeal, "unless possibly where there has been a gross abuse of the judge's discretion, which was not the case" there, and is not the case here. There was no abuse at all, but a lenient regard for the rights of the defendant. S. v. Scott, (507)80 N.C. 365. *Page 406 
The second exception was taken to the ruling of the court, that certain jurors passed by the State were impartial. The record shows that those jurors stated, in answer to questions by the court, that notwithstanding they had formed an opinion about the case from the newspaper accounts, they were sure that they could assume the obligation of jurors and enter the jury box and hear the evidence from the witnesses and the charge of the court and render a verdict entirely in accordance with the law and the evidence, uninfluenced by anything that they had read or any opinion that they may have formed from what they read about the case or otherwise. This statement of the jurors under oath was sufficient to justify the ruling of the court; but it further appears that none of the jurors thus objected to were accepted by the defendant. All of them were challenged peremptorily, and when the twelve jurymen had been chosen, the defendant had the right to two more peremptory challenges which he had not exercised. The right of challenge is not one to accept, but to reject. It is not given for the purpose of enabling the defendant, or the State, to pick a jury, but to secure an impartial one. The defendant got an acceptable jury, for he had two peremptory challenges left, which he could have used if he had thought otherwise. In S. v. Bohanan, 142 N.C. 695, we said: "There is a familiar principle of law which fully meets and answers this objection. The defendant did not exhaust his peremptory challenges, but there were many left to him when the panel was completed. When such is the case, the objection to a juror who could have been rejected peremptorily is not available. S. v. Hensley, 94 N.C. 1021; S. v. Pritchett, 106 N.C. 667;S. v. Teachey, 138 N.C. 587." The judge found that the challenged jurors were indifferent, and his ruling in this respect will not be reviewed here.S. v. Bohanan, supra, where the cases to that date are collected. See, also, S. v. Banner, 149 N.C. 522.
The prisoner next objected to the testimony of Mr. Woodall, (508) which was admitted by the court. The exception is not specific enough, and of course should be so. Wilson v. Lumber Co.,131 N.C. 163. But the evidence was competent and relevant. We do not see why it was not competent to allow the witness to state that he saw the defendant in his buggy looking for some one; heard the shots and immediately "ran down to see what had happened, when he found the prisoner with a pistol in his hand and the deceased wounded and being carried to the house of Horace Ragan." He lived near-by, and knew the parties. Besides, the evidence was harmless, as these facts had already been given in evidence and were not disputed. The evidence was also corroborative of other witnesses, and no request was made that it be confined to that particular purpose. Rule of this Court, No. 27, in *Page 407 
140 N.C. at p. 495. Another conclusive answer to this assignment is that the objection was made to a mass of testimony, some of which, at least, was clearly competent. The rule is stated in S. v. Ledford, 133 N.C. at p. 722: "The objections are general, and the rule is well settled that such objections will not be entertained if the evidence consists of several distinct parts, some of which are competent and others not. In such a case the objector must specify the ground of the objection, and it must be confined to the incompetent evidence. Unless this is done, he cannot afterwards single out and assign as error the admission of that part of the testimony which was incompetent. Barnhardt v. Smith, 86 N.C. 473; Smileyv. Pearce, 98 N.C. 185; Hammond v. Schiff, 100 N.C. 161; S. v. Stanton,118 N.C. 1182; McRae v. Malloy, 93 N.C. 164. The same rule applies to an objection to the judge's charge, when it consists of several propositions. Bost v. Bost, 87 N.C. 477; Insurance Co. v. Sea, 21 Wall., 158. Some of the evidence objected to by the defendant was clearly admissible." See, also, Carmichael v. Telephone Co., 162 N.C. 333.
The next objection is stated in the record without any ruling having been made upon which it could be based. It appears that a witness for the defendant was asked a question on redirect examination, to which the State objected, and the witness was then directed to stand aside, with permission to the defendant to recall and examine him later if desired, defendant's counsel stating that they would submit to the (509) court further authorities upon the question. The defendant's counsel did not recall the witness nor ask permission to recall or examine him further on this point, and no ruling was made by the court. The jurisdiction of this Court is restricted to the correction of errors in the rulings of the court below; and where no ruling has been made, there can be no review here. This is self-evident. Tyson v. Tyson, 100 N.C. 360;Scroggs v. Stevenson, ibid., 354. There was no offer to show what would be the answer of the witness, and the question, on its face, does not sufficiently indicate it. We are not, therefore, informed as to its relevancy. In re Smith's Will, 163 N.C. 464.
This brings us to a consideration of the prayers for instruction and the charge of the court. Exceptions were taken to the refusal of certain requests for instruction to the jury and to the charge. We may say, generally, that the charge of the court was very explicit and accurate, and clearly set forth the principles of law arising upon the evidence. It gave the defendant the full benefit of the doctrine that if the prisoner, when he committed the homicide, had become incapable by the constant use of liquor or drugs to form the intent to kill, or to plan, deliberate, or premeditate beforehand, the jury should not convict him of murder *Page 408 
in the first degree. And the charge in respect to the effect of the liquor or drugs upon his mental condition was also correct, as the court told the jury that if, at the time of the killing, he was mentally unsound or unbalanced to such an extent that he did not know or could not understand the quality of his act, and was not able to distinguish between good and evil, he was not responsible in law, and they should acquit him. This was as far as the judge could well go and stay within the law. The instruction is sustained by S. v. Haywood, 61 N.C. 376. In that case Judge George Green charged the jury as follows: "If the prisoner, at the time he committed the homicide, was in a state to comprehend his relations to other persons, the nature of the act and its criminal character, or, in other words, if he was conscious of doing wrong at the time he committed the homicide, he is responsible. But if, on the contrary, (510) the prisoner was under the visitation of God, and could not distinguish between good and evil, and did not know what he did, he is not guilty of any offense against the law; for guilt arises from the mind and wicked will." This instruction was approved by this Court on appeal, Chief Justice Pearson, for the Court, saying: "We fully approve of the charge of his Honor upon the subject of insanity. It is clear, concise, and accurate; and, as it is difficult to convey to the minds of jurors an exact legal idea of the subject, we feel at liberty to call the attention of the other judges to this charge." This case was also approved in S. v. Potts, 100 N.C. 458, where the Court, by Chief JusticeSmith, said: "This charge is strictly in accordance with S. v. Haywood,61 N.C. 376. We find no authority in support of the proposition contained in the prisoner's eighth instruction, that the prisoner's drunken condition, while not absolving him from all guilt, might repel the malice and reduce his crime to a lower grade, though earnestly pressed in the argument on his behalf. The test of accountability for crime is the ability of the accused to distinguish right from wrong, and that in doing a criminal act he is doing wrong. This is settled in S. v. Haywood,supra." In S. v. Banner, 149 N.C. 519, the present Chief Justice, for the Court, also approved it in these words: "The defense had endeavored to show by a witness that the prisoner was insane, and these questions were legitimate to show that the prisoner was attending to business and knew that it was wrong to shoot any one down. In S. v. Haywood,61 N.C. 376, the Court approved this charge, when the defense of insanity was set up: `If the prisoner was conscious of doing wrong at the time he committed the homicide, he is responsible.'" The charge of the court is also sustained by S. v. Murphey, 157 N.C. 614. In that case it was held that when the defendant was in such a state of voluntary drunkenness at the time of the killing that his mind and reason were so completely *Page 409 
overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill, he could not be found guilty of murder in the first degree. Where a specific intent is essential to constitute crime, the fact of intoxication (or, we may add, the use of drugs) (511) may negative its existence, where the mind is so affected or weakened by it as to be incapable of forming the intent, or by premeditating or deliberating. Clark's Cr. Law, p. 75. Justice Hoke said in S. v. Murphy, supra: "It is very generally understood that voluntary drunkenness is no legal excuse for crime, and the position has been held controlling in many causes in this State, and on indictments for homicide. The principle, however, is not allowed to prevail where, in addition to the over act, it is required that a definite specific intent be established as an essential feature of the crime." He further says: "It (evidence of drunkenness) has been excluded in well considered decisions where the facts show that the purpose to kill was deliberately formed when sober, though it was executed when drunk, a position presented in S. v.Kale, 124 N.C. 816, and approved and recognized in Arzman v.Indiana, 123 Ind. 346, and it does not avail from the fact that an offender is, at the time, under the influence of intoxicants, unless, as heretofore stated, his mind is so affected that he is unable to form or entertain the specified purpose referred to. Wharton sums up the matter by saying that `a person who commits a crime while so drunk as to be incapable of forming a deliberate and premeditated design to kill is not guilty of murder in the first degree.'" Wharton on Homicide, infra. The charge of the judge below in Com. v. Cleary, 148 Pa., 27, approved by that Court, and also by us in S. v. Murphy, supra, was as follows: "If, however, you find that the intoxication of the prisoner was so great as to render it impossible for him to form the willful, deliberate, and premeditated intent to take the life of the deceased, the law reduces the grade of homicide from murder in the first degree to murder in the second degree. The mere intoxication of the prisoner will not excuse or palliate his offense, unless he was in such a state of intoxication as to be incapable of forming this deliberate and premeditated attempt. If he was, the grade of offense is reduced to murder in the second degree." The clear exposition of Dr. Wharton (Wh. Homicide (3 Ed.), p. 811), which is as follows, we have also approved: "Intoxication, though voluntary, is to be considered by the jury in a prosecution for (512) murder in the first degree, in which a premeditated design to cause death is essential, with reference to its effect upon the ability of the accused at the time to form and entertain such a design, not because,per se, it either excuses or mitigates the crime, but because, in connection with other facts, an absence of malice or premeditation may appear. *Page 410 
Drunkenness as evidence of want of premeditation or deliberation is not within the rule which excludes it as an excuse for crime. And a person who commits a crime when so drunk as to be incapable of forming a deliberate and premeditated design to kill is not guilty of murder in the first degree. The influence of intoxication upon the question of the existence of premeditation, however, depends upon its degree, and its effect on the mind and passions. No inference of the absence of deliberation and premeditation arises from intoxication, as a matter of law. And intoxication cannot serve as an excuse for the offender; and it should be received with great caution, even for the purpose of reducing the crime to a lower degree." These principles were stated and applied in S. v. Shelton, post, 513. If we apply them to the facts of this case, it is perfectly clear that the instructions of the court were as favorable to the prisoner as the law permitted. As we have seen, he had the full benefit of the principle in regard to insanity.
We may well doubt if there was sufficient evidence in this case — that is, such as is fit to be considered by a jury — that the prisoner was insane at the time of the homicide. His every action and his general conduct indicated the full possession of his faculties, unimpaired by any previous habit of intoxication or any other sort. That he had a motive is well established, and that he was influenced by his hatred of the deceased, engendered by a rivalry in the same kind of business, appears with equal certainty. He proceeds towards the execution of his purpose to slay with all the intelligence of a man who knew what he intended to do and how he should do it. He prepared himself beforehand and quietly awaited the opportunity he was seeking to destroy (513) his rival. There was an absence of all excitement or impulsiveness, and in its place, a steady and studied effort to carry out his design. But if there was evidence of an unbalanced or abnormal mind, it surely had not reached the stage of insanity such as would excuse the offense and not merely reduce it in degree. There was ample evidence to justify a conviction for the higher felony, but the jury took the benevolent view of it all, and gave him the benefit of the doubt, and the defendant has no reason whatever for complaint.
No error.
Cited: S. v. Rogers, 168 N.C. 114; S. v. Heavener, ib., 164; S. v.Lowry, 170 N.C. 734. *Page 411