STATE OF NORTH CAROLINA v. JOSEPH PERRY BUNN

No. 36

(Filed 1 June 1973)

**1. Criminal Law § 6— voluntary drunkenness**
    Voluntary drunkenness is not a legal excuse for crime.

State v. Bunn

2. **Criminal Law § 6— involuntary intoxication**

It is only when alcohol has been introduced into a person's system without his knowledge or by force majeure that his intoxication will be regarded as involuntary.

3. **Criminal Law § 6— intoxication — specific intent**

Where a specific intent is an essential element of the offense charged, the fact of intoxication may negate the existence of that intent.

4. **Homicide § 8— intoxication — reduction of grade of homicide**

If it is shown that a person on trial for murder in the first degree was so drunk at the time he committed the homicide charged in the indictment that he was utterly incapable of forming a deliberate and premeditated purpose to kill, an essential element of murder in the first degree is absent and the grade of the offense is reduced to murder in the second degree.

5. **Criminal Law § 6; Homicide § 30— evidence of intoxication — failure to submit manslaughter**

In a prosecution for first degree murder, evidence of defendant's intoxication at the time of the killing did not require the trial court to submit manslaughter as a possible verdict; furthermore, since the jury, under proper instructions, found defendant guilty of murder in the first degree, he was not prejudiced by the court's failure to submit manslaughter.

6. **Automobiles § 126; Criminal Law §§ 6, 64; Homicide § 8— breathalyzer results — statutory presumption — inapplicability to homicide and assault cases**

Although there was evidence in a homicide and assault case that a breathalyzer test administered to defendant some four hours after he was placed in jail showed his blood-alcohol content to be .10%, the trial court did not err in refusing to instruct the jury on the presumption created by G.S. 20-139.1(a)(1) that a person with a breathalyzer reading of .10% or more is under the influence of alcohol, since that statute relates only to criminal actions arising out of the operation of a motor vehicle and has no application to the effect of voluntary intoxication upon criminal responsibility for assault and homicide.

APPEAL by defendant from *Cohoon, J.,* 25 January 1971 Session of WAYNE, heard on defendant's petitions for certiorari and initial appellate review by the Supreme Court, docketed and argued as case No. 1 at the Fall Term 1972.

At the 7 December 1970 Session, in the form prescribed by G.S. 15-144, defendant was indicted for the murder of Thomas Vernon Stevens on 13 October 1970. At the same session he was indicted under G.S. 14-33(a) for a felonious assault on 13 October 1970 upon Mrs. Mabel Louise Smith. Without objection the two charges were consolidated for trial.

At the trial evidence for the State tended to show the following facts:

At about 10:30 on the morning of 13 October 1970 as Mrs. Mabel Louise (Bootsie) Smith and eight other women knelt in prayer at the altar of the Oak Street Pentecostal Holiness Church in Goldsboro, defendant came through the swinging doors into the sanctuary. Several women who were sitting in the pews observed him walk straight down the center aisle "at a regular pace." One woman, who watched his approach from behind the communion table, said, "He looked calm and collected . . . as normal as anybody." At the altar he looked down upon the supplicants "like he was looking for someone," and then took a position about one step back of Mrs. Smith. He pulled a gun from his pocket, pointed it at Mrs. Smith's back, and fired four shots into her. At that time, Mrs. Lena Jones Price, who had "felt impressed to go pray with [Mrs. Smith]," was kneeling beside her with her left hand on Mrs. Smith's shoulder. Both women were "deep in prayer" when the bullets struck; one went through Mrs. Price's little finger.

When she was shot Mrs. Smith fell backward on the floor. Defendant stood over her with the pistol and said, "Now say Jesus one more time!" Mrs. Lorayne Furlin, who had also been praying at the altar, walked by defendant on her way to the pew where her 81-year-old mother was sitting. She had started down the aisle with her mother when defendant overtook them and brushed Mrs. Furlin's arm as he passed. He was walking slowly and calmly as he left the church. Mrs. Furlin smelled no alcohol about his person, and she thought she was close enough to have smelled it if there had been any alcohol. She said, "In my opinion if he did not know what he was doing when he came in there that he would have shot more than Bootsie. So, in my opinion he did know what he was doing. In my opinion he was sober when I saw him."

Two of the ladies called the rescue squad and the police while others comforted Mrs. Smith at the altar and joined hands in prayer for her.

About 10:50 a.m. on 13 October 1970 defendant drove into the Gulf Service Center from the direction of the Pentecostal Church, which was about a block away. He was a friend of the proprietor, William Garris, and had been his regular customer for 18-20 years. Defendant drove in "just as normal as he ever

did." He made a circle around the wash bay where Garris and Thomas Vernon (Tommie) Stevens were standing. Assuming that defendant wanted him to service his car Garris started to the car. However, when defendant said, "Tommie," Garris realized he wanted Tommie and stepped back. Defendant appeared entirely normal to Garris. Tommie greeted defendant by asking why he was not working that day, and defendant said to him, "Do you want to see me?" Tommie was then 3-4 feet from the car, holding a service rag in his hand. At that moment Garris saw that defendant "had a gun in his hand, a pistol, and he laid it right on the door and shot straight at Tommie twice." Tommie said, "Ough!" and fell forward on his face. Defendant then drove away from the Service Center "just as normal as anybody could drive."

Defendant and Tommie were friends and, whenever defendant came to the station, they usually talked, joked, and engaged in horseplay if there was time. On this occasion, when he approached defendant, Tommie was happy, laughing, and inquired in a carefree manner why defendant "was laying out of work." Tommie was dead when he was brought to the emergency room of the Wayne County Memorial Hospital. One of defendant's bullets had perforated his aorta; the other passed downward through the right ventricle of his heart.

The rescue squad delivered Mrs. Price and Mrs. Smith at the emergency room at 11:20 a.m. Dr. Wayne Stockdale, who first attended Mrs. Smith, testified: "She looked as if she should have been dead but she wasn't. . . . Her blood pressure was zero over zero. . . . Mrs. Smith never lost consciousness—clinically she should have been unconscious. . . . [S]he should have been dead, but she was still conscious and talking." Three bullets had entered the back of her chest. One had gone straight through the right lung and out the front chest. Two other bullets had gone through the lung and downward through the liver. One of these had gone through the stomach making two big holes; the other went beneath the stomach and out the left side above the kidney. The fourth bullet had gone through her right elbow, breaking the arm. Mrs. Smith was "in absolute shock," in no condition to be moved or to undergo surgery.

Until her blood type could be determined and cross-matched Mrs. Smith was given blood replacements. Then she was given multiple blood transfusions in both arms. She bled continuously and Dr. Winfield Thompson, the surgeon who later operated on

her, removed at least half a gallon of blood from her right chest. During all this Mrs. Smith was never unconscious or incoherent. Dr. Thompson testified, "[S]he never once complained of pain or discomfort, which is another unusual thing about such an injured patient—they usually are frightened and complaining, etc. Mrs. Smith was one of the most quiet people I have ever witnessed under such circumstances. I think this had a great deal to do with her survival. . . . [T]here is no doubt that [her] composure . . . in the emergency room . . . had a great deal to do with her living." At 1:30 p.m. Dr. Thompson, assisted by Dr. Bland, began a three and one-half hour operation, and Mrs. Smith survived the shooting.

In concluding his testimony Dr. Thompson said: "I would like to say this: I take very little credit in saving this woman's life. . . . [I]f Mrs. Smith had not received immediate medical attention in the emergency room, she would have died from the wounds inflicted on her body. Practically speaking, she was risen from the dead. I've never witnessed anyone in my years of surgery survive such injuries." Mrs. Smith testified that at no time did she feel that she "would possibly die" from the wounds she had received. She said, "The Lord had told me that morning of the shooting that I would live and I took Him at His word."

After the shootings, about 11:10 a.m., police officers Kennedy and Jones arrived at defendant's home as he was backing out of his driveway. When defendant saw the police car he drove back in and the police pulled in behind him. Officer Kennedy, armed with a 12-gauge shotgun, got out of the car. Defendant told him that he would not need a weapon, that he was on his way to the city hall to give himself up. Defendant was then arrested for an assault with a deadly weapon, handcuffed, and placed in the police car.

Neither Kennedy nor Jones detected any odor of an intoxicant on or about defendant. He walked normally to the police car and entered it at the officers' request. He also walked into the jail in a perfectly normal manner. He appeared to the officers to be in complete control of both his mental and physical faculties. He did not appear to be drunk, and both officers were of the opinion that he knew right from wrong at that time. Jones had known defendant for four years.

Immediately after he was placed in the police car defendant was given the Miranda warning. He said he understood

it, and it appeared to the officers that he did. (The record states that defendant does not question the court's findings and conclusion that defendant's statement to the officers is competent evidence.) En route to the police station Officer Kennedy asked defendant, "Why did you shoot this woman?" His reply was "I felt like doing it. Have you ever felt like doing something and just wanted to do it? People always said to do what you felt like doing, and this was what I felt like doing, so I did it." He told Kennedy he used a .38 special light-weight model Colt pistol and had thrown it away on the street. He said he did not remember which street, and the officers never did find the gun.

Jailer C. R. Cobb, who had known defendant 10-12 years "booked him in" about 11:30 a.m. and, from then until 3:00 p.m., he observed him from time to time. In his opinion, defendant was not under the influence of any intoxicant and was able to distinguish between right and wrong. About 2:00 p.m. Sergeant Stocks and Captain Floars of the Goldsboro police served upon defendant a warrant charging him with the murder of Tommie Stevens. When Stocks began to read the Miranda warning to him defendant said, "There is no need to read that to me; I have heard that before and I understand my rights." Captain Floars explained that the warning was "required reading" and that defendant "had to have the card read to him." The reading finished, defendant told the officers "that he did not want a lawyer; that he didn't need one"; and that "he did not want to make any statement." To Stocks, who knew defendant, he appeared to be normal, not to be drunk, and to be in control of his mental and physical faculties. In his opinion, defendant knew the difference between right and wrong.

At the time of the shooting defendant was 44 years old and employed as a heavy equipment operator on construction jobs. He had been married about 26 years and was the father of three children. At that time Mrs. Mabel Louise Smith was 33 years old. She had been married since 6 September 1953 and lived with her husband and two children. Both defendant and Mrs. Smith lived in Goldsboro.

The testimony of Mrs. Smith tended to show: She and defendant first met in 1952 when she was 14 and he was 25. She was single; he was married and the father of two children. She "went with" defendant for eight months before learning of his marital status, but she continued to go with him until she herself married. Thereafter she saw him only a few times "to begin

with"; for several years she did not see him at all. Since 1960 they had "maintained an on and off relationship . . . with periods of cessation of about three or four weeks. There would be periods when [they] would see [each other] almost every day for a few minutes . . . and there were periods when [they] would have sexual relations . . . day after day after day. . . . During this time [they] . . . had a very strong attraction and infatuation for one another."

Defendant and Mrs. Smith arranged their rendezvous in various ways and with the help of several people. Defendant spent considerable time at the service stations of both William Garris and C. R. West. Mrs. Smith often called defendant at each of these stations, and both West and Garris took her messages for defendant. Among their trysting places were C. R. West's cabin, E. R. Robbins' house, Ray Jinnette's house, and— on occasions—Mrs. Smith's own home and that of her mother.

Mrs. Smith had been a member of the Pentecostal Holiness Church for about 15 years. There would be revivals at the church and from time to time she "would become a Christian for three or four weeks and stay away from [defendant]." Each time, however, she "would abandon with a guilty conscience the Christian life [she] had been living for three weeks" and resume relations with defendant. Although she had begun to fear him earlier, until a year prior to 13 October 1970 she had a strong desire to be with defendant all the time. During the preceding year they had been intimate many times, and she had been with him a week before the shooting, but she had done so only out of fear and because of his threats. He had become jealous of her husband and began to spy upon her. On several occasions he had told her he was going to kill her, and she continued to call and meet him only "to keep killing off his mind because he talked about it so much." A few weeks before 13 October 1970 he had pulled a gun on her and threatened to shoot her because she had gone to a skating rink alone after telling him she was going there with her husband.

During the year preceding 13 October 1970 defendant would go on "sprees" and drink heavily for weeks. On some of these occasions he would be with Mrs. Smith constantly. If she was not able to see him they would talk on the telephone. "He could carry his liquor pretty good," but she could always tell when she saw him whether he had been drinking. He had to be drinking a lot, however, for her to tell it on the telephone.

State v. Bunn

On the Saturday before the shooting, Mrs. Smith "had promised the Lord to give up defendant." She "had made a firm stand," and she meant to stick to it. On Monday, when she informed defendant of this decision, he said he did not want to talk about that and he would see her Tuesday. On Monday defendant's wife called Mrs. Smith and threatened to tell her preacher, her husband, and her mother about her association with defendant.

On Tuesday, the morning of the shooting, defendant called Mrs. Smith at 8:15 from the home of Bob Robbins and told her he had not gone to work that day because "they caught his car last night." When he asked her to meet him at the Robbins home she began to cry. He told her she had "better shut up crying and talk to him." From then until 10:00 they talked intermittently. She told him she was going to prayer meeting with Mrs. Turnage at 10:30, and he said she had better quit that church or it would be her ruination and that if Pauline Turnage did not quit talking to his wife he was going to kill her too. In their final conversation that morning Mrs. Smith said to him, "J. P., I cannot see you. I want to live a Christian life. I want to serve the Lord and I cannot do this as long as I have any contact with you." He said, "You had better think it over good or you will be sorry. I am leaving here right now and you will be sorry."

Frightened and crying, Mrs. Smith left the house. She picked up Mrs. Turnage, and they went to the Pentecostal Holiness Church where the prayer service had already begun. She found a place at the altar and began to pray. Mrs. Price came over to her, put her hand on her shoulder, and began to pray for her. Shortly thereafter she felt something hit her back and she knew what was happening. She fell backwards on the floor. Defendant stepped over her, bent down and "hollered real loud, 'Say Jesus one more time,' and [she] said, 'I love you, Jesus.'"

Mrs. Smith did not know Tommie Stevens personally; defendant had introduced him to her on one occasion when she had encountered them together. During August 1970 defendant had said to her, "I think Tommie squealed on me, and if I knew it to be the truth, I would kill him right this minute." He said "he believed Tommie told on him about his being at the place where the whiskey was and there was nobody else who could have told on him and it must have been Tommie."

In large part defendant corroborated Mrs. Smith's story of their relationship. His testimony tended to show: Although he started going with Mrs. Smith in 1952 he first told her he loved her in 1964. He continued to love her until 13 October 1970 and had told her so many times. He had never threatened to kill her or to injure her in any way whatsoever. During the past three years she had told him several times that she could not go with him any more, and each time he had told her he would always do anything he could to help her. These separations usually lasted about ten days, when Mrs. Smith would call to say that she loved him more than the Lord, and she could not stay away any longer. During the seven weeks preceding 13 October 1970 they had met many times and she had repeatedly declared her love for him.

On Saturday morning, 10 October 1970, defendant purchased seven pints of liquor and started drinking. By 2:00 p.m. he was drunk. That afternoon his wife overheard a telephone conversation between him and Mrs. Smith in which they agreed to meet at the "Wayne Insurance and Realty Company's place" that night after the revival at her church. He kept the appointment and his wife saw him and Mrs. Smith as they sat in his car talking. He went home, took another drink of liquor and a nerve pill, and went to bed. The next day (Sunday) he was working. During the day he drank the pint of liquor he put in his lunch box. That afternoon when he called Mrs. Smith from Garris' Gulf Service Center she told him that his wife had called her two or three times that day. Defendant went home and continued drinking liquor. After a conversation with his wife, he took another pill and went to bed.

On Monday, October 12th, defendant again took a drink of liquor and a nerve pill before going to his work at Fayetteville. That afternoon, when he called Mrs. Smith at 4:30, she started crying and told him his wife had called and "cussed her out." She had also threatened to tell Mrs. Smith's mother and her husband about their relationship. After mutual declarations of love they terminated the conversation, and he went home to open another pint of liquor. That night he drank liquor with C. R. West and took the bottle, which contained about two drinks, home with him. There he took a nerve pill and a drink out of the bottle and went to bed.

On Tuesday morning he started to work but changed his mind and went to Robbins' house instead. He did this because

State v. Bunn

he was "worried to death" about his wife hearing the telephone conversation; he was upset about Mrs. Smith; and he was "about drunk." When he drove into the Robbins front yard he got the pistol he was accustomed to carrying from the glove compartment as protection against the Robbins dog and took his last pint of liquor from the trunk of the automobile. He told Robbins he had come to see if he couldn't straighten things out with Mrs. Smith but he couldn't call her until 8:00. When he called her she told him she couldn't be with him that morning, and he hung up and took another drink. He then called her back and apologized for hanging up. She assured him of her love and they "talked back and forth" until both "got to crying." She said she would call him back and they hung up. He then finished his pint of whiskey and started on some of Mr. Robbins'. When Mrs. Smith called him back she told him that she couldn't go with him that morning and he said to her, "If you don't meet me this morning you'll be sorry as long as you live." She asked him if he was threatening her, and he told her "no." She told him not to do anything to himself and he assured her he would not. She then asked him what he meant when he said she would be sorry as long as she lived. He told her to forget it and hung up. He then went back into the kitchen and "turned the bottle up" for a "right good size drink." He then called her back and when no one answered he decided to go to the church and tell her "not to go to church, to shout and pray and talk to the Lord, and expect to call [him] back anymore. . . . "

At this point he had no idea of shooting or hurting anybody. He hadn't even thought of Tommie Stevens and he had no ill will of any kind toward him. After getting into his automobile he remembers nothing else until he was within a block of his home. Then, he said, "[E]verything was coming into my mind like a cloud floating. . . . It appeared to me that I had shot Tommie and Bootsie. I could not remember where or under what circumstances I shot Mrs. Smith. The only thing that hit my mind was that I had shot them. I did not remember as to where or under what circumstances I had shot Tommie Stevens. I do not now have any recollection of going into the church and shooting Mrs. Smith. I do not now have any recollection of going to Garris' station and shooting Tommie Stevens. I do not have any recollection of going to Mr. West's station at any time on the morning of October 13th. . . . [T]he gun crossed my mind, and I looked down on the seat and it was gone; I

looked in the glove compartment and it was gone; I got out and looked under the seat for the gun and then it appeared to me that I could remember throwing that gun somewhere but I didn't know where." He remembers being arrested at his home and also telling the officer that he would not need a shotgun; that he was on his way to give himself up. He recalls that after having started to the city hall he returned to get his wife to go with him to bring the car back; that she was standing under the carport crying. He does not remember the ride to the jail or any conversation with the police. He is not aware now of any reason for shooting Mrs. Smith or Tommie Stevens. He loves his wife and at that time he loved Mrs. Smith. He never told Mrs. Smith about three weeks before the shooting that if he knew Tommie Stevens had squealed on him he would kill him.

In 1948 defendant was convicted of transporting fifty gallons of liquor; in 1953, of the possession of several hundred gallons of nontaxpaid liquor; in 1962, of assault on a female; in 1970, of forcible trespass; and he has been convicted for numerous motor vehicle violations over the years. He has never been convicted of driving under the influence of liquor.

Defendant's wife testified that the morning of the shooting he left home about 5:30 after having taken two nerve pills and a drink of whiskey out of the bottle; that he had been drunk the preceding Sunday and Monday nights; and that when he returned home about 11:00 a.m. Tuesday he was drunk. "[H]e was crying, upset, and he looked frightened in his eyes, different from any time [she] had seen him before." She had seen her husband drunk many times and always he had walked very straight and never wobbled. Defendant could hold his liquor well, walk perfectly straight, and deceive anybody who did not know him. She had never seen him stagger and he could be "dog drunk and drive the car fine." At 2:00 p.m., when she saw him in jail, he was still drunk and, in her opinion, "he was not able to know right from wrong." This was also the opinion of defendant's daughter, Linda Wise.

Bob Kevin Robbins, who saw defendant at the home of his father on the morning of 13 October 1970, testified that the defendant was more intoxicated than he had ever seen him before; that he "acted like he was mad—something wrong with him" as he talked on the telephone; and that defendant made a precipitous departure from his father's home. Although de-

fendant "drove all right," in Robbins' opinion, defendant lacked the mental capacity to know right from wrong at that time. This opinion was shared by his wife and stepmother. Mrs. Estelle Robbins testified that before he left, defendant was walking around the kitchen crying and drinking.

C. R. West, who saw defendant on the morning of the shooting between 8:00 and 8:30, testified that defendant went through his station, "stomped his foot like a horse," and wouldn't take a drink when invited to do so. In his opinion defendant was then "a man between being drunk and crazy," and did not know the difference between right and wrong or what he was doing.

At 4:06 p.m. on 13 October 1970, Sergeant Wilson of the Goldsboro police gave defendant the breathalyzer test. The results of the test showed ten hundredths of one percent (0.10%) as the ratio of alcohol in his blood. In Wilson's opinion, at the time he ran the test, the defendant was not drunk and he could distinguish right from wrong.

Defendant was admitted to the forensic unit at Cherry Hospital on 14 October 1970 for a 30-day pretrial psychiatric evaluation. After being evaluated by a forensic team defendant was returned to Wayne County authorities on 17 November 1970 as competent to stand trial.

In the opinion of Dr. Indulis Ritenus, the physician in charge of the forensic unit at Cherry Hospital, on 13 October 1970 defendant was able to distinguish right from wrong. In support of that opinion Dr. Ritenus said: "Psychotic alcoholism has to be distinguished from simple drunkenness. . . . [P]sychotic drunkenness is a break with reality. . . . On the day of the incident the defendant had been drinking but he was not psychotically drunk. . . . [H]e knew the difference between right [and] wrong. In my opinion he was perfectly oriented as to the place because he knew where the church was; he knew where his home was. He was perfectly orientated as to the approximate time because he knew where to find Mrs. Smith at that time. Then he was perfectly orientated as to the person; he knew where Mrs. Smith was, who she was; he knew who his wife was. . . . Of course there as some impairment of judgment . . . caused by his alcoholic intoxication. But, at the same time, he knew how to go to his home; he drove home; he knew where the gas station was; he knew where his friend, Mr.

Tommie Stevens, was working. . . . [H]e was in touch with reality in spite of his alcoholic intoxication. . . . [T]here is no history of previous black-outs in this particular case. . . . On October 13th Mr. Bunn was taking . . . two milligrams of valium. It is a very mild tranquilizer. . . . An adult dose would be between five and ten milligrams three or four times a day. . . . Two milligrams of valium . . . before he drank some alcohol was not of great importance."

In conclusion Dr. Ritenus said: "Well, in my opinion Mr. Bunn on October 13th, 1970, did have no blackout, there was no break with reality, and he knew what he was doing. In my opinion he was suffering from emotional disturbance but at the same time in my opinion, he knew the difference between right and wrong on the 13th of October 1970."

Dr. M. M. Vitols, the superintendent of Cherry Hospital from 1949 until October 1968 and now an associate professor of psychiatry at Virginia Commonwealth University and a physician on the staff of Westbrook Psychiatric Hospital in Richmond, Virginia, examined defendant. On 30 December 1970, he saw him in jail at Goldsboro for an hour and ten minutes, and he saw him again for fifty minutes during the trial of this action.

Dr. Vitols testified as follows: "My opinion is that it is highly possible that at the time Mr. Bunn shot Tommie Stevens he didn't know what was right and what was wrong; that he acted automatically." He based his opinion upon his "examination of Mr. Bunn as a person, his history of drinking, his level of intelligence, and emotional state, his relation with Mrs. Smith as well as Tommie Stevens." On cross-examination, Dr. Vitols was asked this question, "And wouldn't you say, doctor, that one who observed a person over a period of time, to be more specific, say 30 days, would know more about the individual?" In reply, the doctor said, "My answer is actually yes and no. Quantity cannot always surpass quality. . . . Generally in human affairs a conference or consultation is considered a check against error."

Defendant was convicted of both felonious assault and murder in the first degree. From sentences of ten years' imprisonment for felonious assault and life imprisonment for murder, the latter sentence to begin at the expiration of the first, defendant appealed.

State v. Bunn

*Attorney General Morgan; Assistant Attorney General O'Connell for the State.*

*Herbert B. Hulse and George F. Taylor for defendant appellant.*

SHARP, Justice.

Defendant's defense to the charges of murder and felonious assault of which he was convicted is that at the time he shot both Mrs. Smith and Tommie Stevens he was so drunk he was utterly incapable of forming a deliberate and premeditated purpose to kill or to form any criminal intent whatever; and that he did not know the nature and quality of his acts and the difference between right and wrong in relation to them.

[1] It is settled law "that voluntary drunkenness is not a legal excuse for crime." *State v. Propst,* 274 N.C. 62, 71, 161 S.E. 2d 560, 567 (1968). *See State v. Potts,* 100 N.C. 457, 6 S.E. 657 (1888). "[I]nvoluntary intoxication is a very rare thing, and can never exist where the person intoxicated knows what he is drinking, and drinks the intoxicant voluntarily, and without being made to do so by force or coercion." *Perryman v. State,* 12 Okla. Cr. 500, 502, 159 P. 937-38 (1916). In *People v. Morrow,* 268 Cal. App. 2d 939, 948-49, 74 Cal. Rptr., 551, 558 (1969), it is said that the law does not permit a person who commits a crime in a state of intoxication "to use his own vice or weakness as a shelter against the normal legal consequences of his conduct. . . . When, on a given occasion, a person takes his first drink by choice and afterwards drinks successively and finally gets drunk, that is voluntary intoxication, even though he may be an alcoholic." *See also State v. Potts, supra.* With reference to the defense of drunkenness Sir Matthew Hale said, "[I]f a person by the unskilfulness of his physician or by the contrivance of his enemies, eat or drink such a thing as causeth such a temporary or permanent phrensy, as *aconitum* or *nux vomica,* this puts him into the same condition, in reference to crimes as any other phrensy, and equally excuseth him." In his view, these were the "two allays to be allow'd" in the case of drunkenness. 1 Hale, *History of the Pleas of the Crown* 32 (1778).

[2] Thus it is only when alcohol has been introduced into a person's system without his knowledge or by force majeure that his intoxication will be regarded as involuntary. *See*

Annots., 8 A.L.R. 3d 1236 (1966) and 30 A.L.R. 761 (1924). In this case there is no evidence tending to show that defendant, if he was drunk at the time of the shootings, was involuntarily drunk, or that he had become chronically or permanently insane in consequence of his excessive use of alcohol.

[3] Although voluntary intoxication is no excuse for crime, where a specific intent is an essential element of the offense charged, the fact of intoxication may negate the existence of that intent. *State v. Propst, supra.* "A specific intent *to kill*, while a necessary constituent of the elements of premeditation and deliberation in first degree murder, is not an element of second degree murder or manslaughter." *State v. Gordon,* 241 N.C. 356, 358, 85 S.E. 2d 322, 324 (1955).

[4] If it is shown that a person on trial for murder in the first degree was so drunk at the time he committed the homicide charged in the indictment that he was utterly incapable of forming a deliberate and premeditated purpose to kill, an essential element of murder in the first degree is absent. *State v. Propst, supra.* In such a situation it is said that "the grade of the offense is reduced to murder in the second degree." *State v. English,* 164 N.C. 498, 511, 80 S.E. 72, 77 (1913). *See also State v. Alston,* 210 N.C. 258, 262, 186 S.E. 354, 356 (1936); *State v. Foster,* 172 N.C. 960, 966, 90 S.E. 785, 788 (1916); *State v. Shelton,* 164 N.C. 513, 517, 79 S.E. 883, 885 (1913); *State. v. Murphy,* 157 N.C. 614, 618, 72 S.E. 1075, 1077 (1911); Annot., 8 A.L.R. 1052 (1920).

In this case the judge instructed the jury that it might return one of three verdicts: murder in the first degree, murder in the second degree, or not guilty. He correctly charged that in order to convict defendant of murder in the first degree the State was required to satisfy the jury beyond a reasonable doubt that defendant unlawfully killed Tommie Stevens with malice and in the execution of an actual specific intent to kill, previously formed after premeditation and deliberation; and that if they found defendant was so drunk at the time of the killing as to be utterly incapable of forming a deliberate and premeditated design to kill Stevens he could not be guilty of murder in the first degree, for the essential element of premeditation and deliberation would be lacking.

[5] Defendant assigns as error the court's refusal to submit manslaughter as a permissible verdict and "to instruct the jury

State v. Bunn

as to the crime of manslaughter as it applies to the facts, circumstances, evidence and defense presented in this case."

Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Downey*, 253 N.C. 348, 117 S.E. 2d 39 (1960). Defendant's argument is that the evidence of his intoxication tended to prove not only that he was incapable of forming a deliberate purpose to kill but also that he could not have intentionally used the gun as a weapon; that therefore the presumption of malice which arises from a killing by the intentional use of a deadly weapon as a weapon was not present. He contends that he was not guilty of either first or second degree murder and that it was error for the court to refuse an instruction on manslaughter. This assignment of error is overruled.

"[T]he great weight of authority is that intoxication will not reduce a homicide from murder to manslaughter." Annot., 12 A.L.R. 861, 888 (1921). *See also* Annots., 8 A.L.R. 3d 1236 (1966), 79 A.L.R. 897, 904 (1932). Our decisions contain statements in accord with the majority rule. *See State v. Alston, supra; State v. Foster, supra; State v. Shelton, supra; State v. Murphy, supra.*

We also note that when the jury found defendant guilty of murder in the *first* degree it found (1) that he specifically *intended to kill* Tommie Stevens and (2) that he intentionally used the pistol with which he shot and killed Stevens as a weapon. Since, under proper instructions, defendant was found guilty of murder in the *first* degree, he was not prejudiced by the court's failure to submit manslaughter. *See State v. Freeman*, 275 N.C. 662, 170 S.E. 2d 461 (1969).

[6] Defendant's next assignment is that the court erred in refusing to instruct the jury as follows:

"Under the provisions of General Statutes 20-139.1(a)(1) in criminal actions arising out of actions alleged to have been committed by any person while driving a motor vehicle under the influence of alcoholic liquor, the following presumption arises: If there is at that time 0.10% or more by weight of alcohol in the person's blood, it shall be presumed that the person was under the influence of intoxicating liquor at the time the test was given.

"A person is under the influence of intoxicating liquor within the meaning of the law with respect to driving under the

influence when he has drunk a sufficient quantity of intoxicating beverage to cause him to lose the normal control of his bodily or mental faculties to such an extent that there is an appreciable impairment of either one or both of those faculties."

Sergeant Wilson testified that he gave defendant the breathalyzer test approximately four hours after he was put in jail and defendant's blood-alcohol content then registered 0.10%. At the conclusion of Wilson's testimony defendant requested the court to take judicial notice of G.S. 20-139.1(a)(1) (Supp. 1971). The request was refused upon the ground "that defendant was not under arrest for driving under the influence."

Defendant's contention is, that by enacting G.S. 20-139.1(a)(1), the legislature "has decided as a matter of public policy that a breathalyzer reading of 0.10% or more raises a presumption that a person is under the influence of alcohol"; that this presumption is pertinent upon the issue of a defendant's guilt or innocence of any crime; that its application is not restricted to charges involving the operation of a motor vehicle; and that the court prejudiced his defense by refusing to instruct the jury as requested. This contention is untenable.

The tendered instructions state the correct rule of law for determining whether one is guilty of operating a motor vehicle "under the influence of an intoxicating beverage," a violation of G.S. 20-138, but they do not state the law with respect to the effect of voluntary intoxication upon criminal responsibility for homicide and assault.

A person is under the influence of an intoxicant within the meaning of G.S. 20-138 (Supp. 1971) whenever he has consumed sufficient alcohol to appreciably impair his mental *or* bodily faculties or both. *State v. Carroll,* 226 N.C. 237, 37 S.E. 2d 688 (1946).

Certainly one too drunk to form and carry out an intent to kill is under the influence of an intoxicant. However, one may be "under the influence" as that term is defined in *State v. Carroll, supra,* and yet be quite capable of forming and carrying out a specific intent to kill. We note that defendant's breathalyzer test showed his blood-alcohol content to be only 0.10%, the lowest percentage which gives rise to the statutory presumption. "[W]hether intoxication and premeditation can coexist depends upon the degree of inebriety and its effect upon the mind and passions. . . . 'A person may be excited, intoxicated

and emotionally upset, and still have the capability to formulate the necessary plan, design, or intention to commit murder in the first degree.' " *State v. Hamby,* 276 N.C. 674, 678, 174 S.E. 2d 385, 387 (1970).

Our decisions establish that "[n]o inference of the absence of deliberation and premeditation arises as a matter of law from intoxication; and mere intoxication cannot serve as an excuse for the offender. The influence of intoxication upon the question of existence of premeditation depends upon the degree and its effect upon the mind and passion. For it to constitute a defense it must appear that defendant was not able, by reason of drunkenness, to think out beforehand what he intended to do and to weigh it and understand the nature and consequence of his act." *State v. Cureton,* 218 N.C. 491, 494, 11 S.E. 2d 469, 470-71 (1940). *See State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1972); *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22 (1972).

By its express terms, G.S. 20-139.1 (a) (1) is applicable only to criminal actions arising out of the operation of a motor vehicle. We may not extend its application and, were we to do so, confusion could be the only result.

Defendant's other assignments of error require no discussion. The court explicitly and repeatedly put the burden upon the State to satisfy the jury beyond a reasonable doubt of defendant's guilt of the crimes charged. We think it impossible that the jury, at any time during the charge, could have been confused about this requirement. Defendant's motion in arrest of judgment was properly overruled. This court has repeatedly held that an indictment in the words of G.S. 15-144 (1965) charges the essentials of murder and is sufficient. For recent decisions see *State v. Talbert,* 282 N.C. 718, 194 S.E. 2d 822 (1973); *State v. Duncan, supra.*

After a careful consideration of each of defendant's assignments of error, in his trial we find

No error.