STATE OF NORTH CAROLINA v. JAMES JUNIOR BIGGS

No. 9

(Filed 14 April 1977)

1. **Criminal Law § 75.9— non-custodial statements — admissibility**

The trial court in a first degree murder prosecution did not err in denying defendant's motion to suppress statements allegedly made by him to law enforcement officers without benefit of Miranda warnings where, at the time the statements were made, defendant was not under arrest and there had been no restriction of his freedom such as to render him in custody; and the statements were not the product of interrogation but were spontaneously volunteered by defendant.

2. **Criminal Law §§ 75.14, 75.15— defendant's statements — waiver of constitutional rights**

Evidence was insufficient to show that defendant's lack of education, his mental condition or his intoxication at the time he made a statement to an SBI agent precluded any effective waiver of his constitutional rights, and the trial court therefore properly allowed the statements into evidence.

3. **Homicide § 4— first degree murder — premeditation and deliberation — definitions**

First degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation, premeditation meaning thought beforehand for some length of time, however short, and deliberation meaning an intention to kill, executed by defendant in a cool state of blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation.

4. **Homicide § 21— premeditation and deliberation — sufficiency of evidence**

Evidence of premeditation and deliberation was sufficient for the jury in a prosecution for first degree murder where it tended to

State v. Biggs

show that defendant confessed to an SBI agent that he stabbed the victim because she had falsely sworn out an assault warrant against him and he was not sorry he had done so; he had planned to shoot the victim but was unable to obtain any shotgun shells; and defendant stated that he would have stabbed the victim even if he had not been drinking because he had it on his mind.

5. **Criminal Law § 118.2— State's contentions — jury instructions proper**

The trial court in charging on the State's contentions did not express an opinion in violation of G.S. 1-180, since there was ample evidence introduced to support the contentions as given and there was no erroneous statement or application of the law in the challenged instructions.

6. **Homicide § 24— first degree murder — burden of proof — jury instructions proper**

The trial court's instructions in a first degree murder case properly placed upon the State the burden of proving beyond a reasonable doubt each element of the offense charged, and the court's instructions on the presumption of malice did not violate defendant's privilege against self-incrimination.

7. **Homicide §§ 26, 27— second degree murder — voluntary manslaughter — intent to kill — voluntary intoxication — erroneous instruction**

The trial court's erroneous instruction in a first degree murder prosecution that a specific intent to kill was a necessary element of the crimes of second degree murder and voluntary manslaughter and that voluntary intoxication was a complete defense to those crimes was not prejudicial to defendant.

8. **Constitutional Law § 80; Homicide § 31— first degree murder — life sentence substituted for death penalty**

A sentence of life imprisonment is substituted for the death penalty imposed in this first degree murder prosecution.

APPEAL by defendant from *Tillery, J.,* 28 June 1976 Session, GATES County Superior Court. Defendant was charged with first-degree murder. He entered a plea of not guilty.

This case has previously been before this Court and a new trial was awarded. *State v. Biggs,* 289 N.C. 522, 223 S.E. 2d 371. Pursuant to a consent order the case was transferred from Chowan County to Gates County for the second trial.

The State's evidence tended to show that at about 1:30 a.m. on 12 July 1975 Deputy Sheriff Glenn Perry received a phone call from the Edenton Police Department informing him that Doris Jean Ferebee (Doris) had been stabbed. He proceeded to her home but after a thorough search of the premises was unable to find Doris. There was a butcher knife and a fire poker

on the kitchen table and he observed spots of blood beside the table.

Sheriff Troy Toppin came to the Ferebee home and shortly thereafter directed Perry to go to defendant's home to ascertain if defendant could help locate the missing woman. Deputy Perry, who had earlier that night served a warrant on defendant charging him with assault on Doris Jean Ferebee, proceeded to defendant's home. Defendant agreed to accompany him to the Ferebee home for the purpose of helping them locate Doris. The circumstances surrounding an inculpatory statement made by defendant to Deputy Sheriff Perry as they returned to the Ferebee home and subsequent statements made by defendant to Sheriff Toppin and SBI Agent William Earl Godley will be more fully set forth in our discussion of the questions presented by this appeal.

At about 3:00 a.m. SBI Agent Godley found the body of Doris Jean Ferebee on the shoulder of the road about 215 yards from her residence.

Antoinette Ferebee, the twelve-year-old daughter of the deceased, testified that on the night of 11 July 1975, while sleeping in her mother's bed with her brothers and sisters, she was awakened by a tap on the window. She heard defendant calling her mother's name. He then broke open the locked front door and came into the bedroom, carrying an open pocketknife in his hand. Defendant told the children to get up and go find their mother. Antoinette went upstairs, where she found her mother hiding under a bed. After her mother told her to go away, she went back downstairs and told defendant that she was unable to find her mother. Defendant threatened to kill the children if they didn't find their mother for him. After Doris had received assurances that defendant would not hurt her, she came downstairs armed with a fire poker and a knife. She and defendant began to argue about the warrant which she had earlier caused to be issued for his arrest. At that point, in the presence of her children, defendant stabbed Doris. Defendant then told the children to take one last look at their mother because "[t]he next time you see her she will be in a casket."

There was expert medical testimony that Doris Jean Ferebee died as a result of four stab wounds in the chest and stomach, any one of which was sufficient to have caused death.

Defendant offered no evidence.

The jury returned a verdict of guilty of first-degree murder and the trial judge entered a judgment imposing the death penalty.

*Attorney General Edmisten, by Assistant Attorney General Charles J. Murray, for the State.*

*W. T. Culpepper III for defendant.*

BRANCH, Justice.

[1] Defendant assigns as error the denial of his motion to suppress statements allegedy made by him to Deputy Sheriff Perry and Sheriff Toppin.

Before the introduction of evidence the trial judge, pursuant to defendant's motion to suppress, conducted a *voir dire* hearing to determine the admissibility of statements allegedly made by defendant to police officers. On *voir dire* Deputy Sheriff Perry testified that on 12 July 1975, as a result of a telephone call, he went to the residence of Doris Jean Ferebee. Upon his arrival, he was told by Officer Mizelle, of the Edenton Police Department, that Doris' child had told him that her mother had been hurt. The witness and other officers searched the Ferebee house but were unable to find the child's mother. Sheriff Toppin then directed him to go to defendant's house to see if he could help locate Doris. Deputy Perry found defendant, his father and his brother at home and he asked defendant if he had been to the Ferebee house that night. Defendant replied that he had left there at about 1:30 a.m. He then agreed to go to the Ferebee residence to help locate the missing woman. Defendant was not placed under arrest at that time, but Deputy Perry did ask him if he had a knife. Defendant replied that he did and voluntarily gave the knife to the officer. During the ride back to the Ferebee home, defendant inquired: "Mr. Perry, you mean she's not in the house?" When Officer Perry replied "no," defendant said, "I don't see how the bitch could go any place the way she was hurt."

Deputy Sheriff Perry unequivocally stated that neither he nor Officer Mizelle, who had accompanied him to defendant's home, asked any questions during their return trip to the Ferebee home. Upon arriving at the Ferebee home the witness

told Sheriff Toppin about the statement made by defendant. Sheriff Toppin thereupon immediately advised defendant of his *"Miranda* rights."

Sheriff Toppin testified that he sent Deputy Perry to defendant's home to see if he knew where Doris was. He did not instruct the deputy to arrest defendant. However, when Deputy Perry told him of defendant's statement he immediately advised defendant of his constitutional rights, including his right to have a lawyer appointed for him before he answered any questions. The Sheriff testified:

> . . . I asked him if he understood that. He said he did. "Do you understand each of these rights I have explained to you?" I asked him if he understood that. He said he did. I said, "Having these rights in mind without a lawyer present, do you wish to answer any questions now?" He said he would. I did not at any time threaten or coerce the defendant to answer those questions in any regard other than what he wanted to answer them. In my opinion the defendant did appear to understand his rights. . . .

Thereafter, in response to the Sheriff's questions, defendant stated that he did not know where Doris was "because he didn't see how she could get out of the house the way he had stabbed her." The Sheriff then directed his deputy to carry defendant to the Chowan County jail.

Defendant then testified that Deputy Perry came to his home at about 1:30 on 12 July 1975 and asked him if he would help find Doris. He said that the officer told him "that he wasn't under arrest." At the officer's request he gave him his knife. As they proceeded to the Ferebee home he asked Deputy Sheriff Perry, "You mean she's not in the house?". He testified that he said nothing about Doris being hurt. He further stated that upon his arrival at the Ferebee home, Sheriff Toppin advised him that he had a right to remain silent but gave him no other warnings. He denied that he told the Sheriff that he had stabbed Doris Jean Ferebee.

Judge Tillery found facts consistent with the evidence offered by the State and concluded:

> Upon the foregoing findings of fact, the court concludes as a matter of law that statements made to Deputy

Sheriff Glenn Perry were made freely and voluntarily and in a noncustodial situation, and that the statements were not the result of any interrogation or questioning by any law enforcement officer and were entirely unsolicited.

\*     \*     \*

Upon the foregoing findings of fact, the court concludes as a matter of law that any statements made thereafter to Sheriff Toppin were made by the defendant freely, voluntarily, understandingly and in awareness of his constitutional right to remain silent and of his right to the presence of counsel, and after having intelligently, expressly and vocally waived his right to remain silent and his right to the presence of counsel by his affirmative answer to the last question which was asked him by Sheriff Troy Toppin.

He thereupon denied defendant's motion to suppress the statements made by defendant to Deputy Sheriff Perry and Sheriff Toppin.

It is well established that a confession obtained as a result of custodial interrogation, without the *Miranda* warnings is inadmissible. *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602. 2 Stansbury's N. C. Evidence (Brandis Rev. 1973) § 184, page 72. However, such warnings are not required when defendant is not in custody or otherwise deprived of his freedom of action in any significant way. *Miranda v. Arizona, supra; State v. Sykes,* 285 N.C. 202, 203 S.E. 2d 849.

We think the very recent case of *Oregon v. Mathiason,* ____ U.S. ____, 50 L.Ed. 2d 714, 97 S.Ct. 711, is noteworthy. There, the United States Supreme Court considered the admissibility of certain inculpatory statements made by an accused who was charged with murder and, in pertinent part, stated:

In the present case, however, there is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a one half-hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way."

Such a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restrain on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system. which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." . . .

Even more apropos to the case under consideration is the rule that volunteered and spontaneous statements made by a defendant to police officers without any interrogation on the part of the officers are not barred by any theory of our law. *Miranda v. Arizona, supra; State v. Bell,* 279 N.C. 173, 181 S.E. 2d 461; 4 N.C. Index 3d, Criminal Law § 75.9.

In instant case all the evidence, including defendant's testimony, shows that defendant was not under arrest and that there had been no such restriction of his freedom as to render him in custody when he made the inculpatory statement to Officer Perry. It is equally clear that the statement was not the product of interrogation, but was spontaneously volunteered by defendant. We, therefore, hold that Judge Tillery correctly denied defendant's motion to suppress the statement made to Deputy Sheriff Perry.

The principal thrust of defendant's attack upon the statement made to Sheriff Toppin is that since the prior statement to Officer Perry was involuntarily made, a presumption arose imputing the same prior influence to his subsequent statement. He argues that the State has failed to overcome this presumption by clear and convincing evidence. *State v. Silver,* 286 N.C. 709, 213 S.E. 2d 247. Our holding that the original statement made to Deputy Sheriff Perry was properly admitted into evi-

---

State v. Biggs

---

dence completely deflates this argument. Suffice it to say that the trial judge's findings which supported his ruling that the statements made to Sheriff Toppin were admissible into evidence were supported by ample, competent evidence and are therefore binding upon this Court. *State v. Fox,* 277 N.C. 1, 175 S.E. 2d 561. Thus, the statements made to Sheriff Toppin by defendant were properly admitted into evidence.

[2]  Defendant assigns as error the admission of statements made by him to SBI Agent Godley. In view of our earlier consideration of this very question, we do not deem it necessary to discuss defendant's contention that the statements made to SBI Agent Godley are presumed to be involuntary because of a prior involuntary confession made to Deputy Sheriff Perry. However, by this assignment of error, defendant also contends that the entire record shows that defendant's lack of education, his mental condition and his intoxication at the time he made the statement to Agent Godley precluded any effective waiver of his constitutional rights.

In this connection Agent Godley, testifying on *voir dire,* stated that he talked with defendant in the office of the Sheriff of Chowan County on 12 July 1975. He further testified:

I first asked him if he remembered being advised of his constitutional rights by Sheriff Toppin out at Doris Jean Ferebee's residence. Mr. Biggs stated that he did. . . .

I told Mr. Biggs . . . that I wished to discuss matters related to her [Doris Jean Ferebee] death with him, that I needed to advise him of his constitutional rights again due to the fact that I hadn't advised him personally in the time lag, and I did so. . . .

\*    \*    \*

The defendant appeared to understand the rights as I went over them on the sheet and pointed them out to him. I specifically asked him to stop me if there was a question. On one occasion he did stop me and had a question. This was in reference to the word "coercion" in the waiver of rights form. . . . I explained to him what the word "coercion" means. . . .

\*    \*    \*

The defendant did not appear abnormal in any way to me, did not walk or talk abnormally. . . .

. . . He did tell me that he was intoxicated, but in my opinion he was not. . . .

At the conclusion of the *voir dire* hearing, the court made extensive findings of fact including the following:

> During the time they were together [Agent Godley and defendant], the defendant did not appear to be intoxicated. There was no odor of alcohol upon his breath. He had no difficulty in standing or walking, and on the one occasion he asked a question, he asked an intelligent question which was the meaning of the word "coercion."

Judge Tillery then concluded and ruled:

> Upon the foregoing findings of fact, the court concludes as a matter of law that any statements made to W. E. Godley by James Junior Biggs at Chowan County Sheriff's office on July 12, 1975 were made freely, voluntarily, understandingly and in full awareness of the defendant's constitutional rights to counsel and against self-incrimination.

> The court further concludes as a matter of law that the defendant expressly and vocally and in writing waived his right to counsel and his right to remain silent, and that this also was done freely, voluntarily and understandingly.

> . . . The motion to suppress the same and any motion to suppress State's Exhibit No. 1 is denied.

This record discloses no substantial evidence of defendant's lack of mental capacity. Neither does defendant's showing that he had only a fourth grade education render his confession inadmissible since even complete illiteracy does not preclude understanding or a free exercise of the will. *State v. White,* 291 N.C. 118, 229 S.E. 2d 152. Nor does the evidence show that, as a result of intoxication, defendant did not know what was being said or done at the time he made the statement to Agent Godley. *State v. Jackson,* 280 N.C. 563, 187 S.E. 2d 27. On the other hand, there was plenary evidence to support the trial judge's findings and conclusion that defendant's statements to SBI Agent Godley were made voluntarily and understandingly and that he understandingly waived his constitutional rights, including his right to counsel. We are bound by these findings which

State v. Biggs

support the trial judge's conclusions. *State v. Haskins,* 278 N.C. 52, 178 S.E. 2d 610.

There was no error in the trial court's denial of defendant's motion to suppress statements made by him to SBI Agent Godley.

It is next argued by defendant that there was insufficient evidence of premeditation and deliberation to submit the case to the jury on the charge of first-degree murder.

[3] First-degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65; *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652. Premeditation means "thought beforehand for some length of time, however short." *State v. Reams, supra.* Deliberation means "an intention to kill, executed by the defendant in a cool state of the blood, in furtherance of a fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose, and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Benson,* 183 N.C. 795, 111 S.E. 869.

In *State v. Patterson,* 288 N.C. 553, 220 S.E. 2d 600, this Court held that evidence of defendant's hostile feelings toward the deceased because of her prosecution of him for assault was a circumstance which tended to show premeditation and deliberation.

[4] In instant case SBI Agent Godley testified that defendant had confessed to him that he stabbed Doris Jean Ferebee because she had falsely sworn out an assault warrant against him and that he was not sorry that he had done so. Agent Godley further testified as follows:

> . . . I asked Mr. Biggs at that point if he had been planning in advance to stab Mrs. Ferebee, and Mr. Biggs stated that he had planned on shooting her but he was unable to obtain any shotgun shells.
>
> *          *          *
>
> . . . [H]e stated that . . . he inquired from about 10 people about how he could get a shotgun shell and that no one would give him one. . . .

Agent Godley also testified that upon further questioning of defendant as to his intoxication at the time of the stabbing, the following exchange occurred: "I then asked Mr. Biggs if he would have stabbed Mrs. Ferebee even if he had not been drinking, and his reply was, 'Yep, because I had it on my mind'."

Thus, there was evidence that defendant, by his own admission, planned in advance to kill Doris Jean Ferebee in order to gratify a desire for revenge, and carried out that fixed design under unusually cruel circumstances. Clearly this was sufficient to support a jury verdict that defendant unlawfully killed Doris Jean Ferebee with malice and with premeditation and deliberation.

[5] Defendant contends that the trial judge expressed an opinion in violation of G.S. 1-180, when he charged the jury as follows:

The State has further offered evidence that the defendant felt that this was an unfair and unfounded charge, and that he went to a place in Edenton called Choke's Grill and began to drink liquor or drink some alcoholic beverage, in any event, that he consumed a considerable amount of some alcoholic beverage, and that in addition he smoked some marijuana cigarettes; that he began to inquire about a shotgun shell having in mind killing Doris Jean Ferebee, and that he asked a number of people, as many as ten, perhaps, and nobody would give him a shotgun shell; that he obtained at Choke's Grill a knife and walked from Edenton to the home of Doris Jean Ferebee who lived on Paradise Road outside of Edenton; that when he got there, he went to the window and tapped on it and called the name "Jean" and at this point, Mrs. Ferebee got out of bed and when he got no response, he broke the front door in, tearing two fasteners or locks partly aside in the process; that he went in and demanded of the children of Mrs. Ferebee to know where she was, and one of the children, that is, Antoinette Ferebee, said she didn't know. After some discussion, he sent the children upstairs to find Mrs. Ferebee, and Antoinette found her mother underneath a bed; that she, that is, Mrs. Ferebee, told her to go ahead, meaning to leave her alone, and she went downstairs and told the defendant she didn't know where her mother was; that

during this entire time the defendant had in his hand an open pocketknife.

Ordinarily, objections to the charge in stating contentions of the parties must be brought to the court's attention in time to afford opportunity to correct the alleged misstatement. *State v. McAllister*, 287 N.C. 178, 214 S.E. 2d 75; *State v. Butler*, 269 N.C. 733, 153 S.E. 2d 477. However, this rule does not apply when a misstatement incorrectly applies the law or presents an erroneous statement of the law. *State v. Winford*, 279 N.C. 58, 181 S.E. 2d 423. Nor does the rule apply when the statement of contentions is not supported by the evidence. *State v. Pike*, 267 N.C. 312, 148 S.E. 2d 136.

Here defendant did not voice his objections in time for any possible misstatement of the State's contentions to be corrected. There was ample evidence introduced to support the contentions as given and there was no erroneous statement or application of the law in the challenged instructions. Even had defendant timely voiced his objections, we can find nothing in the language of this instruction which tends to express an opinion of the trial judge.

We find no merit in this contention.

**[6]** Defendant assigns as error the court's instruction that: "[I]f the State proves beyond a reasonable doubt that the defendant intentionally killed Doris Jean Ferebee with a deadly weapon or intentionally inflicted a wound upon Mrs. Ferebee with a deadly weapon that proximately caused her death, the law implies first that the killing was unlawful and second that it was done with malice."

Relying upon *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881, he takes the position that the instruction violated his rights to due process as guaranteed by the Fourteenth Amendment to the United States Constitution because it relieved the State of its burden of proving beyond a reasonable doubt each element of the offense charged.

In *Mullaney* Justice Powell, speaking for the Court, succinctly stated the holding in that case: "We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a

homicide case." We have held in a number of cases subsequent to the *Mullaney* decision that the presumptions of malice and unlawfulness arising from an intentional assault with a deadly weapon proximately causing death are constitutionally sound. *State v. Lester,* 289 N.C. 239, 221 S.E. 2d 268; *State v. McCall,* 289 N.C. 512, 223 S.E. 2d 303; *State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575; *State v. Williams,* 288 N.C. 680, 220 S.E. 2d 558. In *State v. Hankerson, supra,* Justice Exum, speaking for the Court, explained:

> The *Mullaney* ruling does not, however, preclude all use of our traditional presumptions of malice and unlawfulness. It precludes only utilizing them in such a way as to relieve the state of the burden of proof on these elements when the issue of their existence is raised by the evidence. The presumptions themselves, standing alone, are valid and, we believe, constitutional. . . .

In instant case the trial judge meticulously adhered to the *Mullaney* requirement that the State must bear the burden throughout of proving the element of malice beyond a reasonable doubt when he further instructed as follows:

> The burden is on the State to prove beyond a reasonable doubt that the defendant did not act in the heat of passion upon adequate provocation, but rather that he acted with malice. If the State fails to prove this, that is, fails to meet this burden, the defendant can be guilty of nothing more than voluntary manslaughter. . . .

Here all the evidence showed a cold-blooded killing pursuant to a fixed plan to satisfy a craving for revenge. There was no evidence of heat of passion upon sudden provocation. Thus, even though an issue as to this mitigating factor was not "properly presented" as it was in *Mullaney,* defendant had the benefit of an instruction requiring the State to prove the absence of heat of passion beyond a reasonable doubt. We find nothing in the trial judge's instructions which violates the requirements of due process as enunciated in *Mullaney.*

By this same assignment of error defendant contends that this rule of law concerning the presumption of malice violates his privilege against self-incrimination as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

In *State v. Williams, supra,* this Court examined the effect of the presumption of malice upon the allocation of the burden of proof. It was there stated:

> . . . Establishment of the presumption requires the triers of fact to conclude that the prosecution has met its burden of proof with respect to the presumed fact by having established the required basic facts beyond a reasonable doubt. This does not shift the ultimate burden of proof from the State but actually only shifts the burden of going forward so that the defendant must present some evidence contesting the facts presumed. . . .

Defendant argues that since he was the only available defense witness, this rule resulted in an unconstitutional coercion to waive his right against self-incrimination. This argument is overcome by the following language contained in footnote 28 of the *Mullaney* decision:

> . . . Many States do require the defendant to show that there is "some evidence" indicating that he acted in the heat of passion before requiring the prosecution to negate this element by proving the absence of passion beyond a reasonable doubt. [Citations omitted.] Nothing in this opinion is intended to affect that requirement. . . .

We conclude that the trial judge's instructions neither relieved the State of its burden of proving beyond a reasonable doubt every element of the offense charged, nor violated defendant's constitutional privilege against self-incrimination. This assignment of error is overruled.

[7] Defendant next attacks the following instruction by the trial judge:

> . . . I charge that if upon considering the evidence with respect to the defendant's state with regard to intoxication or a drugged condition you have a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first degree murder, you will not return a verdict of guilty of first degree murder, and with respect to the charges of second degree murder and voluntary manslaughter, the same general rule with regard to voluntary intoxication or drugged condition would apply, and the court instructs you that if you reach those possible

verdicts and find that the defendant was intoxicated or drugged, you should consider whether that condition affected his ability to form this specific intent which is required for conviction of either second degree murder or voluntary manslaughter.

In order for you to find the defendant guilty of either second degree murder or involuntary (sic) manslaughter, you must find beyond a reasonable doubt that he had the intent to kill, and if as a result of intoxication or a drugged condition he did not have that intent, you would have to find the defendant not guilty.

Defendant properly takes the position that the challenged instruction incorrectly states that a specific intent to kill is a necessary element of the crimes of second-degree murder and voluntary manslaughter, *State v. Meadows,* 272 N.C. 327, 158 S.E. 2d 638, and that voluntary intoxication is a complete defense to those crimes. *State v. Bunn,* 283 N.C. 444, 196 S.E. 2d 777. However, it is well established that on appeal the defendant has the burden not only to show error, but also to demonstrate that the error affected the result adversely to him. 4 N.C. Index 3d, Criminal Law § 168. Had the jury reached and considered the lesser-included offenses of second-degree murder and voluntary manslaughter, the effect of the admittedly erroneous portion of the instructions was to improperly increase the State's burden of proof and to erroneously permit the jury to consider a complete defense to those charges which is not provided by law.

Defendant does not attack the trial judge's instruction on murder in the first degree. In that portion of the charge the court correctly instructed the jury that they must find that defendant formed a specific intent to kill before they could return a verdict of guilty of murder in the first degree. Implicit in the jury's verdict of guilty of first-degree murder is a finding that defendant formed a specific intent to kill. Having found this element, there was nothing in the erroneous instructions which would have deterred the jury from returning a verdict of guilty of second-degree murder or a verdict of guilty of voluntary manslaughter. Obviously the jury chose to believe the State's evidence which supported a finding of an unlawful killing committed with malice and after premeditation and deliberation.

We hold that defendant was not prejudiced by the erroneous charge as to the lesser-included offenses of second-degree murder and voluntary manslaughter. This assignment of error is overruled.

Defendant argues that it was error for the trial judge to refuse to give his requested instruction to the effect that premeditation and deliberation must occur prior to the proximate cause of death. We note that the trial judge gave a complete and accurate instruction as to the elements of premeditation and deliberation which adequately conveyed the rather obvious message of defendant's requested instruction.

[8] Finally, defendant attacks the imposition of the death penalty in this case. In *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978, the United States Supreme Court invalidated the death penalty provisions of G.S. 14-17 (Cum. Supp. 1975), the statute under which defendant was indicted, convicted and sentenced to death. Therefore, the judgment imposing a sentence of death upon defendant is vacated and by authority of the provisions of 1973 Sess. Laws, c. 1201, § 7 (1974 Session), effective 8 April 1974, a sentence of life imprisonment is substituted in lieu of the death penalty in this case.

This case is remanded to the Superior Court of Gates County with directions (1) that the presiding judge, without requiring the presence of defendant, enter a judgment imposing a sentence of life imprisonment for the first-degree murder of which defendant has been convicted; and (2) that in accordance with this judgment the clerk of superior court issue a commitment in substitution for the commitment heretofore issued. It is further ordered that the clerk furnish to defendant and his attorney a copy of the judgment and commitment as revised pursuant to this opinion.

No error in the verdict.

Death sentence vacated.