STATE OF NORTH CAROLINA v. JAMES LEE PRIMES

No. 694A84

(Filed 13 August 1985)

1. Searches and Seizures § 3; Convicts and Prisoners § 2— detention of inmate and seizure of clothing—no violation of Fourth Amendment

In a prosecution for first degree murder, the seizure of defendant's clothing was not unlawful as being a product of an unconstitutional detention where defendant was a prison inmate. Within prison walls, the Fourth Amendment inquiry is whether the detention and questioning is reasonable given the particular facts and circumstances; here, there was a real need and ample justification for every action taken against defendant; the invasion of defendant's personal rights at each stage was minimal and escalated only as the need for more intrusive invasions escalated. Fourth Amendment to the United States Constitution.

2. Jails and Jailers § 1; Convicts and Prisoners § 2— correctional superintendent's authority to detain inmate

In a prosecution for the murder of a dental technician by a prison inmate, articles of clothing seized from defendant after he was detained by a correctional superintendent were not inadmissible on the grounds that the superin-

State v. Primes

tendent lacked authority to arrest defendant. Whether defendant was arrested when he was detained by the superintendent was immaterial, given his status as an inmate and the superintendent's reasonableness in detaining him. A correctional superintendent has the inherent authority to help control the prison environment and maintain security. G.S. 15A-401.

3. **Criminal Law § 128.2— S.B.I. chemist testified out of order—chain of possession later ruled insufficient—no mistrial**

In a prosecution for first degree murder, the trial court did not abuse its discretion by refusing to grant a mistrial where the court allowed an S.B.I. chemist to testify out of order concerning hair and fiber found on trousers seized from defendant, the court warned the jury that the chemist's testimony could later be stricken, the court later ruled that the State had not established a sufficient chain of custody to permit introduction of the trousers, and the court gave a very thorough and explicit instruction to the jury reminding them not to consider the testimony for any purpose. Moreover, there was substantial additional evidence establishing defendant's presence at the crime scene.

4. **Homicide § 21.5— evidence of first degree murder sufficient—felony murder**

The State's evidence was sufficient to go to the jury on the theory of first degree murder despite defendant's statements to a fellow inmate which tended to show that defendant acted in the heat of passion where the State sought a first degree murder conviction under the felony murder rule based on defendant's alleged attempted rape of the victim; the victim was discovered on the floor with her clothes partially displaced; the pathologist who examined the body concluded that his findings were consistent with a homicidal strangulation and attempted rape; three inmates testified that defendant on different occasions had expressed either an intent or a desire to have sexual relations with the victim; and another inmate testified that defendant had told him after the killing that he had gone to the victim's office, made sexual advances, and been ordered out.

5. **Criminal Law § 181— sentence of life imprisonment after mandatory death sentence ruled unconstitutional—life sentence erroneously declared a nullity**

The trial court erred by declaring a life sentence a nullity where defendant was initially sentenced to death on 21 April 1976 as mandated by the then existing statute and gave notice of appeal; the United States Supreme Court declared North Carolina's mandatory death penalty statute unconstitutional; the State sought dismissal of the appeal because it was not perfected and resentencing of defendant; defendant's counsel informed the court that defendant did not wish to perfect his appeal; the State's motion to dismiss was granted and defendant was sentenced to life imprisonment in 1979; defendant filed a motion for a new trial alleging ineffective assistance of counsel; and defendant's right to appeal was reinstated and the life sentence was declared a nullity by a different judge in 1984. The actions of the trial judge in entering a sentence of life imprisonment was in accord with the directives issued by the North Carolina Supreme Court in similar cases.

Justice MITCHELL took no part in the consideration or decision of this case.

ON appeal from defendant's conviction of first degree murder, entered at the 21 April 1976 Criminal Session of WAKE County Superior Court, *Judge Godwin* presiding. Defendant initially received the death penalty but was resentenced to life imprisonment on 15 October 1979 upon defendant's motion following the United States Supreme Court's decision in *Woodson v. North Carolina*, 428 U.S. 280 (1976), declaring the state's mandatory death penalty statute unconstitutional.

*Lacy H. Thornburg, Attorney General, by J. Michael Carpenter, Special Deputy Attorney General, for the state.*

*L. Michael Dodd for defendant appellant.*

EXUM, Justice.

Defendant by this appeal presents three issues for determination: (1) Whether certain evidence was seized from defendant, a prisoner, during a period in which he was unlawfully detained, in violation of the Fourth Amendment of the Federal Constitution[1] or in violation of certain North Carolina statutes; (2) whether the court erred in denying defendant's motion for mistrial, and (3) whether the court erred in denying defendant's motion to dismiss. We answer these questions in the negative and find no error in defendant's trial.

I.

The evidence offered by the state tended to show the following:

On 19 May 1975, Jennette Fish was employed as a dental assistant at the Triangle Correctional Center, a minimum custody facility adjacent to Central Prison in Raleigh. Defendant was an inmate at the Triangle facility assigned to work duty in the den-

---

1. Defendant makes no argument resting on any provision of the North Carolina Constitution; consequently we address this issue only in terms of Fourth Amendment jurisprudence developed by the United States Supreme Court.

tal clinic. Fish was working alone in the dental clinic on 19 May, since her supervisor was attending a conference, and had been instructed not to see patients but to prepare paper work.

Two coworkers of Fish were with her until approximately 2 p.m., at which time they observed her unlocking and entering her office. One of them, Jacob Lane, warned Fish that she was alone on the hall.

Louis Smith, a dental technician at Triangle, escorted defendant and another inmate to the dental lab shortly after 12:30 p.m. Approximately an hour later, defendant complained that he was sick and returned to the Triangle facility. Defendant was seen entering the dental office where Fish worked at approximately 3:45 p.m. by honor grade inmate James Brooks.

At approximately 4:55 p.m., J. R. Inscoe, a correctional superintendent at Triangle, encountered defendant in the hallway as Inscoe moved toward the restroom. Defendant was perspiring and said he wished to speak with Inscoe. Inscoe asked him to wait. When Inscoe returned, defendant informed him that something was wrong with "the lady in the dental clinic." Defendant said she was lying on the floor and that he tried putting water on her but she didn't move.

Inscoe escorted defendant to the nearby control center and left him there. He then entered the dental clinic and discovered the body of Fish. Her face ànd neck were swollen and discolored and her clothes partially displaced. Inscoe then returned to defendant and removed him to an inner office. After calling an ambulance, Inscoe later returned to defendant and, for the first time, noticed scratches on defendant's neck. At this point, Inscoe placed a guard outside the office containing defendant. State Bureau of Investigation agents later seized several articles of clothing from defendant, including a pair of white socks containing a hair similar in color, racial origin and microscopic details to the victim's.

The pathologist's report concluded that Fish's death was consistent with a homicidal strangulation and attempted rape, occurring some four to six hours prior to his examination at 9:05 p.m.

Several of defendant's fellow inmates testified that defendant approached them at various times between 2:30 and 4 p.m. and stated that he was in trouble and needed money with which to es-

cape. In addition, three inmates testified that defendant, on various occasions prior to Fish's death, expressed sexual desires for the victim and his intent to approach her sexually.

Richard Crisp, a cellmate of defendant's after Fish's death, testified that defendant said he didn't mean to hurt Fish or to kill her. He approached her sexually and when she ordered him to get out and threatened to "put the man on him," he began "working up on her." When Fish hit defendant in the neck, he strangled and killed her.

Defendant presented no evidence at trial.

## II.

[1] Defendant contends the trial court erred by admitting into evidence a pair of white socks worn by defendant at the time he was detained by Correction Superintendent Inscoe on 19 May 1975 and subsequently seized from his person by SBI agents. Examination of the socks disclosed presence of a hair similar in color, racial origin and certain microscopic details to that of the victim, thus tending to place defendant near the victim at some point.

Defendant contends the socks were inadmissible as evidence because they were obtained during an illegal search and seizure. He contends that he encountered Corrections Superintendent Inscoe in the hall around 4:55 p.m. and commented to Inscoe that something was wrong with the lady in the dental clinic. Inscoe told defendant to wait and proceeded en route to the restroom. Inscoe then returned, took defendant to the control center and told him to remain there. Defendant contends that he was under arrest from this point on. Only at this point, after defendant was already in custody, did Inscoe proceed to the dental clinic where he discovered the body of Fish.

Defendant argues that he was arrested by Superintendent Inscoe at a time when Inscoe possessed neither an arrest warrant nor sufficient information to support probable cause to believe that a crime had been committed and that defendant committed it. Thus, his entire detention was illegal and under *Henry v. United States*, 361 U.S. 98 (1959), the search conducted pursuant to it was illegal and any evidence seized during it was inadmissible.

In support of his argument, defendant relies heavily upon Inscoe's testimony that "prior to going to the dental office, I had him [defendant] seated at the control center, in custody of the officer at that location." He also relies upon the trial court's conclusion of law, made following voir dire on the motion to suppress, that "the defendant was in actual custody of Superintendent Inscoe in connection with the death of Mrs. Fish from about 4:55 o'clock p.m. on May 19th, 1975, until after his clothing, . . . [was] seized by Agent Davenport; . . ."

The state responds that despite Inscoe's testimony and the trial court's conclusion of law, defendant was not under arrest at 4:55 p.m. when Inscoe asked him to remain at the control center. Rather, he was merely the subject of an administrative detention, a device recognized by the United States Supreme Court in *Hewitt v. Helms*, 459 U.S. 460 (1983), as appropriate in circumstances involving possible inmate misconduct. Defendant was not under arrest, the state contends, until much later when Inscoe removed him to a private office under guard. By this time, Inscoe knew: (1) he had encountered defendant perspiring and in an agitated condition in the hall outside the dental clinic; (2) Fish had been killed; (3) defendant had admitted being with the victim and trying to rouse her with water and (4) defendant had visible scratches on his neck. These circumstances taken together were clearly sufficient to justify Inscoe in arresting defendant without a warrant, the state contends.

While both parties apparently assume the resolution of this issue turns upon whether defendant was "under arrest" when first detained by Superintendent Inscoe at 4:55 p.m., or merely under administrative segregation, we take a somewhat different tack.

The more fundamental question is whether the Fourth Amendment requires probable cause before prison officials could detain defendant, an inmate in the state prison system, within the confines of the prison where defendant was already in custody. If, in this context, no such arrest was required, then whether Inscoe "arrested" defendant by asking him to remain at the control center is immaterial.

The issue of constitutional rights and protections vis-a-vis the prison environment is not a new one. The United States Supreme

Court in a number of opinions has examined the effect upon an individual's constitutional rights of being incarcerated for the commission of crimes. That Court has held that persons sentenced to prison are not stripped of all constitutional rights at the prison gate. Rather, basic constitutional rights adhere inside as well as outside the prison walls. *See, Wolff v. McDonnell*, 418 U.S. 539 (1974); *Lee v. Washington*, 390 U.S. 333 (1968) *(per curiam)* (invidious discrimination is as intolerable within a prison as without); *Johnson v. Avery*, 393 U.S. 483 (1969) (prisoners retain constitutional rights to petition government for redress of grievances, including a reasonable right of access to the courts); *Pell v. Procunier*, 417 U.S. 817 (1974) (prisoners retain First Amendment rights not inconsistent with status as prisoners or objectives of system); *Haines v. Kerner*, 404 U.S. 519 (1972) (prisoners retain the protections of due process); *Cruz v. Beto*, 405 U.S. 319 (1972) *(per curiam)* (prisoners retain the right to a reasonable opportunity to exercise religious freedom).

However, the Supreme Court has also stressed that incarceration "carries with it the circumscription or loss of many significant rights." *Hudson v. Palmer*, --- U.S. ---, 82 L.Ed. 2d 393, 401 (1984). The Court's insistence that prisoners be accorded basic constitutional rights extends only to "those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Id.*

> [S]imply because prison inmates retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations. 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' *Price v. Johnston*, 334 U.S. 266, 285 (1948); see *Jones v. North Carolina Prisoners' Labor Union, supra*, at 125; *Wolff v. McDonnell, supra*, at 555; *Pell v. Procunier, supra*, at 822. The fact of confinement as well as the legitimate goals and policies of the penal institution limits these retained constitutional rights. *Jones v. North Carolina Prisoners' Labor Union, supra*, at 125; *Pell v. Procunier, supra*, at 822. There must be a 'mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.' *Wolff v. McDonnell, supra*, at 556.

*Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979). The restriction of certain rights is justified by the need to maintain an orderly and secure prison environment, *id.*, and also serves as a reminder "that under our system of justice, deterrence and retribution are factors in addition to correction." *Hudson v. Palmer*, --- U.S. ---, 82 L.Ed. 2d 393, 401-02. Thus, the curtailment of certain rights is justified simply by an inmate's status as prisoner as well as by institutional needs.

Applying these general principles to the present case, we are guided by several decisions of the United States Supreme Court wherein appellant prisoners alleged that certain practices of prison officials violated the Fourth Amendment prohibition against unreasonable searches and seizures.

In *Hudson v. Palmer*, --- U.S. ---, 82 L.Ed. 2d 393 (1984), an inmate at Bland Correctional Center in Bland, Virginia, charged that an unannounced "shake-down" search of his cell by prison officials was conducted solely to harass him and was unreasonable under the Fourth Amendment. The district court granted summary judgment in favor of prison officials. The Fourth Circuit Court of Appeals reversed on this point, however, holding that a prisoner enjoys a "limited privacy right" in his cell entitling him to protection against searches designed solely to harass or humiliate. Thus, the shake-down of a single prisoner's cell was permissible only if done pursuant to an established plan reasonably designed to deter or discover possession of contraband or on reasonable belief that the particular prisoner possessed contraband. The Supreme Court reversed, holding that:

> [S]ociety is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

*Id.* at 402-03.

The *Hudson* Court stressed the volatile nature of the prison environment and the duty of prison officials to assure the safety

of prison staff, administrative personnel, and visitors. *Id.* at 403. It reasoned:

> Determining whether an expectation of privacy is 'legitimate' or 'reasonable' necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. . . . We strike the balance in favor of institutional security, which we have noted is 'central to all other corrections goals,' *Pell v. Procunier,* 417 U.S. at 823, 41 L.Ed. 2d 495, 94 S.Ct. 2800, 71 Ohio Ops. 2d 195. A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that '[l]oss of freedom of choice and privacy are inherent incidents of confinement.' *Bell v. Wolfish,* 441 U.S. at 537, 60 L.Ed. 2d 447, 99 S.Ct. 1861.

*Id.* at 403-04. Finally, the Court rejected the lower court's holding that unannounced individual cell searches must be pursuant to a central plan. "A requirement that even random searches be conducted pursuant to an established plan would seriously undermine the effectiveness of this weapon. . . . We share the . . . view that wholly random searches are essential to the effective security of penal institutions." *Id.* at 404-05.

In *Bell v. Wolfish,* 441 U.S. 520 (1979), the Court examined the scope of constitutional rights guaranteed to pretrial detainees during their confinement prior to trial. The case began as a class action on behalf of detainees at the Metropolitan Correctional Center, a short-term custodial facility in New York City primarily designed to house pretrial detainees. The facility also housed some convicted inmates, primarily those awaiting sentencing or transfer to other facilities and those whose presence was required at trial or were sentenced for contempt. A number of inmates filed an action on behalf of convicted inmates and pretrial detainees protesting many practices of prison officials. The complaint alleged, among other things, violations of statutory and

constitutional rights arising from overcrowding, lengthy confinement, lack of sufficient facilities and staff, etc. Among the practices challenged was the prison's policy of requiring inmates to expose their body cavities for visual inspection as part of strip searches conducted after every contact visit with a person from outside the institution. Prison officials argued that cavity searches were necessary to discover and deter smuggling of drugs, weapons and other contraband into the facility.

Both the district court and the Court of Appeals disapproved the strip searches, absent probable cause to believe the particular inmate was concealing contraband. The court of appeals labeled the searches a "gross violation of personal privacy" which "cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility." *Id.* at 558.

The Supreme Court reversed, holding that while body cavity searches, of all the practices challenged by appellants, gave the most cause for concern, these searches did not violate the Fourth Amendment. The Court phrased the issue as whether visual body cavity searches could ever be conducted on less than probable cause of persons already lawfully in custody. The Court expressly assumed that both convicted prisoners and pretrial detainees retain some Fourth Amendment rights. It stressed, however, that the Fourth Amendment prohibits only unreasonable searches and the searches at issue, in the context of the prison environment, were not unreasonable. The Court reasoned:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *E.g., United States v. Ramsey,* 431 U.S. 606 (1977); *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976); *United States v. Brignoni-Ponce,* 422 U.S. 873 (1975); *Terry v. Ohio,* 392 U.S. 1 (1968); *Katz v. United States,* 389 U.S. 347 (1967); *Schmerber v. California,* 384 U.S. 757 (1966). A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband

is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, App. 71-76, and in other cases. *E.g., Ferraro v. United States*, 590 F. 2d 335 (CA6, 1978); *United States v. Park*, 521 F. 2d 1381, 1382 (CA9 1975). That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

*Id.* at 559. The Court concluded that a balancing of "the significant and legitimate security interests of the institution against the privacy interests of the inmates," justified the searches at issue. *Id.* at 560.

These authorities demonstrate that application of the Fourth Amendment prohibition on unreasonable searches and seizures within prison walls is not necessarily identical to its application in society at large. It is beyond dispute that an ordinary citizen may not be detained against his will for questioning or search in connection with a crime absent a valid arrest warrant or the existence of probable cause. As both *Hudson* and *Bell* instruct, however, in the prison context the inquiry is not necessarily whether sufficient grounds exist to search and seize, but whether the search and detention are reasonable given the particular facts and circumstances of the situation. That is, our courts have determined that search and seizure grounded upon less than probable cause is *per se* unreasonable in society at large. The same is not necessarily true in every search and seizure case within the prison environment. Defendant's argument in the present case, therefore, may fail even if we accept, arguendo, his contention that he was detained by Superintendent Inscoe at 4:55 p.m. before Inscoe possessed sufficient information regarding Fish's death to constitute probable cause. Resolution of the question presented depends rather on "a balancing of the need for the particular search [and detention] against the invasion of personal rights that the search [and detention] entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). When all the circum-

stances of this case are put on the scales and balanced according to the foregoing principles, we are satisfied that defendant's detention was well within the Fourth Amendment's reasonableness requirement.

Superintendent Inscoe encountered defendant in the hall outside the dental clinic. Defendant appeared agitated and was perspiring. He informed Inscoe "there's something bad wrong with the lady in the dental office . . . Well, she's lying on the floor and I went over and put some water on her but she didn't move." At this point Inscoe instructed defendant to have a seat at the control center. He then entered the dental clinic and discovered the victim's body. After some lapse of time, Inscoe returned to the control center, inquired whether defendant was hungry and asked him to move to Inscoe's office. No guard was posted. After a further period of time, Inscoe returned to his office to check on defendant. Defendant was leaning forward with his elbows on his knees. The neck of defendant's shirt was dropped open and as Inscoe approached to speak with defendant, he noticed two scratches on defendant's neck. At this point, Inscoe stationed a guard outside the' office door with instructions to keep defendant therein. Defendant's clothes were thereafter seized by SBI agents.

The initial actions of Inscoe in asking defendant to remain at the control center were reasonable. Defendant had apprised Inscoe in very general terms of a problem in the dental clinic. Defendant's statement suggests he was with the victim at some point. Inscoe acted reasonably in keeping defendant close by while he investigated the situation. Inscoe's first responsibility was to offer aid, if possible, to the victim. This he tried to do. However, it was reasonable to detain defendant during this period lest more information become necessary from defendant. Later, after discovery of the brutal scene in the clinic, Inscoe acted reasonably in continuing to detain defendant. Defendant had reported what turned out to be a murder. He had admitted his presence there. His appearance when first encountered by Inscoe was agitated and nervous. Defendant was at that point at least a possible witness and source of information concerning a criminal act. Later, after discovering the scratches on defendant's neck, Inscoe acted reasonably in viewing defendant as a suspect and placing him under guard.

Thus on one side of the scale there are facts demonstrating a real need and ample justification for every action taken against defendant at the time it was taken by Superintendent Inscoe. On the other side of the scale there are facts showing that Inscoe's invasion of defendant's personal rights at each stage were minimal, escalating only as the need for more intrusive invasions escalated. We conclude, therefore, that all of Inscoe's actions in detaining defendant met the Fourth Amendment's test of reasonableness. The subsequent search of his person and seizure of his clothes were not, therefore, unlawful as being the product of an unconstitutional detention.

Our decision on this point is supported by *Hayes v. United States*, 367 F. 2d 216 (CA10 1966), which reached the same result as we on facts very much like those before us.

[2]   Defendant also contends the state failed to demonstrate that Inscoe had statutory authority to arrest defendant. N.C.G.S. § 15A-401 allows a law enforcement officer to arrest a suspect, without a warrant, if he has probable cause to believe the person has committed an offense. Since the state offered no evidence that Inscoe was empowered to arrest defendant, defendant argues the arrest was invalid and any evidence seized thereby was inadmissible.

We find no merit in this argument. We have already held that whether defendant was arrested or not at 4:55 p.m. is immaterial, given his status as an inmate and our conclusion that Superintendent Inscoe acted reasonably in detaining him. Moreover, Inscoe was a correctional superintendent at the facility. As such, it could hardly be disputed that his position carried with it the inherent authority to help control the prison environment and maintain security, including detaining defendant until prison officials could deal with the extraordinary series of events which unfolded before them.

### III.

[3]   By his next assignment of error, defendant contends the trial court committed prejudicial error in failing to declare a mistrial after it ruled certain evidence inadmissible which had already been put before the jury during the testimony of a witness called out of order by the state.

Upon the state's motion, the trial court exercised its discretion to allow Malcolm Davis, a chemist with the State Bureau of Investigation at the time of Fish's death, to testify out of order since, at the time of trial, he lived in Tennessee. Davis testified regarding his examination of a pair of white trousers seized from defendant upon which were discovered five hairs identical in color and race to the victim's, and a red fiber identical to fibers removed from a sweater the victim was wearing when discovered.

Later in the trial when the state attempted to introduce the white pants into evidence, the trial court, upon defendant's objection, ruled the evidence inadmissible finding that the state had failed to establish a sufficient chain of custody to permit introduction of the evidence. Defendant thereupon moved for a mistrial, which motion was denied. Defendant now claims the trial court abused its discretion by failing, *ex mero motu*, to require the state to introduce evidence at a voir dire prior to Davis's testimony which would have demonstrated the evidence's inadmissibility, and in failing to declare a mistrial due to the irreparable injury visited upon defendant via Davis's testimony.

We disagree. The decision whether to grant a motion for mistrial rests within the sound discretion of the trial judge and will not ordinarily be disturbed on appeal absent a showing of abuse of that discretion. *State v. Smith*, 301 N.C. 695, 272 S.E. 2d 852 (1981); *State v. McLean*, 294 N.C. 623, 242 S.E. 2d 814 (1978). "It is well settled in this jurisdiction that when the court withdraws incompetent evidence and instructs the jury not to consider it, any prejudice is ordinarily cured. *E.g., State v. Perry*, 276 N.C. 339, 172 S.E. 2d 541 (1970); *State v. Moore*, 276 N.C. 142, 171 S.E. 2d 453 (1970)." *State v. Smith*, 301 N.C. 695, 697, 272 S.E. 2d 852, 855 (1981). Thus, it follows that where the trial judge withdraws incompetent evidence and issues a cautionary instruction to the jury to disregard it, the court's refusal to grant a mistrial based upon the prior introduction of such evidence to the jury will ordinarily not amount to an abuse of discretion.

Such is the case here. The trial judge in the present case took great care in allowing Davis to testify out of turn to warn the jury that Davis's testimony could later be stricken and excluded from its consideration if the state failed to lay a proper foundation for its admission. Later, upon determining that the

state failed to meet this burden, the court gave a very thorough and explicit instruction to the jury reminding them of his earlier warning and repeatedly instructing them not to consider the testimony at issue for any purpose.

Under the circumstances of this case we think the curative instruction was sufficient to cure any possible prejudice inuring to defendant by virtue of Davis's earlier testimony. The disputed testimony was, in essence, cumulative. The hair and fiber found upon defendant's pants at most tended to place him in close proximity to the victim at some point. The state eventually produced other competent evidence to this same effect. SBI agents testified that a similar hair was found upon defendant's socks, which were properly admitted into evidence. Also, Superintendent Inscoe testified that defendant admitted having been with the victim and attempting to rouse her by putting water on her. Given the additional substantial evidence of defendant's presence at the crime scene offered by the state and the court's curative instructions removing Davis's disputed testimony from the jury's consideration, we are satisfied there was no abuse of discretion in the trial court's failure to declare a mistrial.

IV.

[4]  Finally, defendant contends that the trial court erred in denying his motion to dismiss the charge of first degree murder made at the close of the state's evidence and the close of all the evidence and in failing to submit the case to the jury only on the lesser included offense of voluntary manslaughter. The state offered the testimony of Richard Elmer Crisp, a fellow inmate who shared a cell with defendant following Fish's death. Crisp testified that he and the defendant discussed the case and defendant told him "I didn't mean to hurt her and I damn sure didn't want to kill her. She made me mad and I slapped her and then I panicked." Defendant contends that the state's own evidence thus demonstrates that defendant acted in the heat of passion upon adequate provocation rather than with premeditation or malice. We disagree.

Defendant relies heavily in his argument upon the testimony of Crisp elicited by the state. While this testimony does tend to support the notion that defendant acted in the heat of passion, this testimony alone does not resolve the issue. The state is not

bound by exculpatory statements elicited by it and attributed to defendant if other competent evidence cast doubt upon its veracity. "The introduction by the state of an exculpatory statement made by a defendant does not preclude the state from showing the facts concerning the crime to be different, and does not necessitate a nonsuit if the state contradicts or rebuts the defendant's exculpatory statement." *State v. May*, 292 N.C. 644, 658, 235 S.E. 2d 178, 187, *cert. denied*, 434 U.S. 928 (1977). Thus, if the state produced evidence which would support the charge of first degree murder, then the submission of that charge to the jury was proper, notwithstanding Crisp's testimony.

In evaluating the other evidence offered by the state, two points are important. First, on a motion to dismiss, all evidence, whether direct or circumstantial, must be considered in the light most favorable to the state and the state is entitled to every reasonable inference to be drawn from the evidence. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Second, the state did not proceed under a theory of premeditation and deliberation in this case. The prosecutor announced at the outset of the trial that the state was seeking a first degree murder conviction under the felony murder rule based on defendant's alleged attempted rape of the victim. The trial court so instructed the jury and submitted the case to it only on a felony-murder theory. Thus, Crisp's statement, going as it does to the issue of premeditation and deliberation, would not preclude a conviction of first degree murder, even if believed by the trial jury.

The state's evidence tended to show that the victim was discovered on the floor of the dental clinic with her clothes partially displaced. The pathologist who examined the body concluded that his findings were consistent with a homicidal strangulation and attempted rape. In addition, three inmates testified that defendant on different occasions expressed either an intent or a desire to have sexual relations with the victim. Another inmate, Terry Lee Sykes, testified that he was defendant's close friend and that defendant told him after he was back in Central Prison for killing Fish that he went to Fish's office and "cracked on her," meaning that he made sexual advances, and she ordered him to get out. When viewed in the light most favorable to the state, this evi-

dence was clearly sufficient to justify submission of the case to the jury on a theory of first degree felony murder.

We find no merit in defendant's assignments of error regarding the guilt phase of his trial.

[5]   We deem it advisable, however, to comment upon the sentencing phase of defendant's case. Defendant was initially sentenced to death on 21 April 1976 as mandated by the then existing statute. Defendant gave notice of appeal in open court. On 2 July 1976, the United States Supreme Court declared North Carolina's mandatory death penalty statute unconstitutional in *Woodson v. North Carolina*, 428 U.S. 280 (1976). On 15 October 1979, the state instituted proceedings before Judge Robert Gaines seeking dismissal of the appeal for defendant's failure to perfect it and resentencing of defendant in light of *Woodson*. Judge Gaines, upon being informed by defendant's counsel that defendant did not wish to perfect the appeal, granted the state's motion to dismiss and resentenced defendant to life imprisonment.

On 25 April 1984, defendant filed a motion for appropriate relief alleging ineffective assistance of counsel and seeking a new trial. After hearing this motion Judge Anthony Brannon found that defendant had never knowingly and willingly waived his right to appeal. He therefore reinstated defendant's right to appeal. He also declared the life sentence imposed by Judge Gaines a nullity.

This Court was required to respond to the *Woodson* decision in a number of cases wherein the death penalty was imposed at trial. *State v. Woods*, 293 N.C. 58, 235 S.E. 2d 47 (1977); *State v. Williams*, 292 N.C. 391, 233 S.E. 2d 507 (1977); *State v. May*, 292 N.C. 644, 235 S.E. 2d 178 (1977); *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563 (1977); *State v. Hopper*, 292 N.C. 580, 234 S.E. 2d 580 (1977); *State v. Gray*, 292 N.C. 270, 233 S.E. 2d 905 (1977); *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977). In each of those cases, this Court vacated the death penalty and remanded the case with instructions to the superior court to enter a judgment of life imprisonment without requiring the presence of defendant. *Id.* The actions of Judge Gaines in entering a sentence of life imprisonment in the present case was in accord with the directives issued by this Court in similar cases. Thus, while Judge Brannon may have properly found that defendant never knowingly and volun-

tarily waived his right of appeal, it was error for him to nullify that part of Judge Gaines' order converting defendant's original death sentence to one of life in prison. That portion of Judge Brannon's order is therefore reversed and the sentence imposed by Judge Gaines is reinstated.

No error in the trial.

Life sentence reinstated.

Justice MITCHELL took no part in the consideration or decision of this case.